Vivian WOOLFOLK et al.,

v.

Otis L. BROWN, etc., et al.

Civ. A. No. 225–70–R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 22, 1971.

John M. Levy, Legal Aid Society of Roanoke Valley, Roanoke, Va., Dennis Yeager, Douglas Broadwater, Center on Social Welfare Policy and Law, New York City, for plaintiffs.

Theodore J. Markow, Anthony F. Troy, Asst. Attys. Gen. of Va., Richmond, Va., Harry W. Garrett, Jr., Atty. for the Commonwealth, for Bedford County; Bedford, Va., for defendants.

## MEMORANDUM

MERHIGE, District Judge.

This is a class action challenging certain regulations and practices of Virginia officials charged with the duty of administering the State's plan of Aid to Families with Dependent Children (AFDC), a public assistance program funded jointly by the federal and state governments. The four named plaintiffs are mothers who at various times received AFDC payments for the support of themselves and their children. These payments were terminated in full pursuant to a provision in the state public assistance plan concerning refusal to accept an offer of employment. Defendants are the Director of the Department of Welfare and Institutions, the Chairman and members of the Board of Welfare and Institutions, the Superintendent of Public Welfare of Bedford County, Virginia, and the Chairman and members of the Local Welfare Board of Bedford County. This is a class action pursuant to Rule 23(b) (2), the named plaintiffs representing parents and their children, eligible for AFDC benefits under Virginia's program and subject to the employment regulation discussed below.

On April 23, 1970, Chief Judge Haynsworth, pursuant to the request of the author of this opinion, designated Circuit Judge Butzner and District Judge Kellam to sit on a three-judge panel in the case. On April 28, 1970, this Judge entered a temporary restraining order requiring the continued provision of assistance to the individual plaintiff, Woolfolk, until the full panel reached its decision.

For reasons which will appear, the panel has decided to remand the statutory issues, including supremacy clause questions, to this Judge sitting alone, with an eye to the possibility that the dispute can be resolved without treating the Constitutional issues. Rosado v. Wyman, 397 U.S. 397, 403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970).

The plaintiffs contend that §§ 211.4E and F of the Virginia Manual of Policy and Procedure for Local Welfare Departments are in conflict with the due process and equal protection clauses of the Fourteenth Amendment and with the Social Security Act, 42 U.S.C. §§ 601–609, 630, et seq. The suit is brought under 42 U.S.C. § 1983. Jurisdiction lies in this Court, regardless of the amount in controversy, under 28 U.S.C. § 1343(3). Caulder v. Durham Housing Authority, 433 F.2d 998 (4th Cir. 1970).

The regulation in question reads as follows:

E. *Evaluation of Employment Opportunities*—An applicant for or recipient of assistance is expected to make use of or develop resources available to him in relation to his capacity to do so. If it appears that he has a potential for employment, the extent of services needed from the worker will vary according to the individual's characteristics, training and working experience, as well as his environmental circumstances. The worker needs to be sensitive to the factors affecting the individual's ability to assume a worker role and to be aware of the point at which he may be expected to avail himself of work opportunities.

A work opportunity is considered available to an individual, provided he is deemed able to assume a worker role, if the following conditions are met:

1. *Availability of a Specific Job*— The availability to the particular individual of a specific job within his competence must be established. The name and address of the prospective employer, the type of work, amount of wages and working hours must be recorded.

2. *Physical and Mental Capacity*— The individual must be able, physically and mentally, to perform the duties of the job available to him. If there is doubt as to his physical or mental capacity to do the work, an evaluation of his condition is to be secured by the agency from the appropriate source, such as a physician or psychologist.

3. *Suitability of the Job*—The job must not result in undue hardship, unreasonable changes in living arrangements, neglect of other responsibilities to members of the family, exposure to hazardous conditions, or adverse effect on school progress.

F. *Refusal to Accept a Job*—Refusal by an otherwise eligible individual sixteen years of age and over to accept a work opportunity available to him under the conditions specified above renders him ineligible for assistance. If such an individual is a husband or parent living in the home, the wife or children are ineligible also.

Income from employment shall be verified, if possible, by written evidence, such as income tax withholding forms or pay envelopes. If wages fluctuate, pay envelopes for a period of several months will be necessary. If the employment is of a seasonal or intermittent nature, it may be possible only to verify by the agency's knowledge of prevailing rates in the community. In this event, the record should reflect this information.[1]

---

1. In July of 1970, the regulation was superseded by § 305.4 of the Virginia Manual of Policy and Procedure for Local Welfare Departments, incorporating child care requirements and certain insubstantial changes:

305.4 SPECIAL PROVISIONS RELATED TO EMPLOYMENT

A. *Evaluation of Employment Opportunities*—An applicant for or recipient of assistance, other than OAA, is expected to make use of employment opportunities available to him in relation to his capacity to do so. In evaluating the individual's ability to assume a worker role, the agency is to take into consideration his training, work experience, and environmental circumstances.

A work opportunity is considered available to an individual if the following conditions are met:

1. *Availability of a Specific Job*—The availability to the particular individual

Evidence has been presented in the form of depositions, exhibits, and answers to interrogatories, and the case has been submitted for decision after argument and briefing.

After hearing, the Court invited the United States to state its views on the issues as amicus curiae. The Government brief and the parties' responses thereto have been received and studied.

The plaintiffs contend that the regulation, which shall be referred to as the Virginia work rule, sets up an unauthorized additional requirement of eligibility for AFDC, contrary to the statutory mandate that state plans provide that "aid * * * shall be furnished with reasonable promptness to all eligible individuals," 42 U.S.C. § 602(a) (10).

They argue additionally that certain 1967 amendments to the Social Security Act incorporating the Work Incentive Program (hereinafter WIN), 42 U.S.C. § 630, et seq., and regulations promulgated thereunder, render the Virginia work rule invalid for the reason that it is either in direct conflict with federal provisions or would frustrate their effective implementation.

The parties have stipulated that the Woolfolk plaintiffs were qualified to receive AFDC benefits during August of 1969, and they were also so qualified at the time of suit but for Vivian Woolfolk's failure to accept an employment opportunity. The Calloway plaintiffs, it is also stipulated, received aid from August, 1969, until April 30, 1970, and were qualified for aid at the time of suit but for the failure of Rosetta, Vera, and Gayle Calloway to accept a job offer. Terminations of aid were made pursuant to the Virginia work rule. It is further stipulated that Bedford County, where the four named plaintiffs reside, participates in the WIN program and that vacancies in the program for that area existed from August 1969 to May 1970.

The scope and effect of the Virginia work rule as applied appeared from the evidence. The rule was promulgated prior to the enactment of the legislation incorporating the WIN program (Brown depos., 4). It was adopted in May, 1967 (defendants' Exhibit 3), in response to the requirement of the Department of Health, Education and Welfare that, in determining a particular individual's need for AFDC payments, only actual

of a specific job within his competence is established.

2. *Physical and Mental Capacity*—The individual must be able, physically and mentally, to perform the duties of the job available to him. If there is doubt as to his physical or mental capacity to do the work, an evaluation of his condition is to be secured by the agency from the appropriate source, such as a physician or psychologist.

3. *Suitability of the Job*—The job must not result in undue hardship (e. g., excessively long working hours or wages below the prevailing rate in the community) ; unreasonable changes in living arrangements, neglect of other responsibilities to members of the family, exposure to hazardous conditions, or adverse effect on school progress. In ADC, there must be assurance that adequate child care will be provided during the caretaker's working hours.

B. *Refusal to Accept a Job*—If an applicant for or recipient of OAA elects to be employed, income is to be counted as specified in Section 305.1. Refusal by other eligible individuals sixteen years of age and over to accept available work opportunities under the conditions specified above renders them ineligible for assistance. If such an individual is a husband or parent living in the home, the wife or children are ineligible also.

ADC may not be denied or terminated, however, on the basis of the caretaker's refusal to accept employment unless adequate and appropriate child care services are available, either through a service payment by the agency or, under an approved plan, at no cost. In ADC, if a *stepfather refuses to accept* available and suitable employment, his wife is no longer an eligible caretaker and must be removed from the assistance unit, but the children's eligibility is not affected.

Because of the grave hardship which can result, action to deny or terminate assistance should be taken, in any case, only after careful exploration and an explanation to the individual of the consequences of his decision.

income could be taken into consideration as an available resource. See 45 C.F.R. § 203.1(b). Rather than presuming certain unearned income to be available as a resource, it was decided to rule ineligible those who refused suitable, available employment. The new regulation was submitted to and accepted by a family service representative in the Charlottesville, Virginia, regional office, on June 21, 1967 (defendants' Exhibit 4).

The Virginia work rule is not satisfied by part time employment (Brown depos., 39). "Appropriate" day care for children must be afforded (*Id.*, 40). The job itself need only be "appropriate work, and work that is available." (*Id.*, 42). Compensation need only be "commensurate with similar type employment available to the free working person in that community," (*Id.*, 48; see also Armstrong depos., 76).

The sanction of termination of all AFDC payments, to parent and child alike, is imposed because it is thought to be a greater motivator to secure employment than a lesser deduction (Armstrong depos., 71). No particular information forms are used in the termination process (*Id.*, 61). A detailed investigation of working conditions, beyond wages and hours, is not made (*Id.*). Although the rule admonishes welfare officials to cancel benefits only after consultation, no specific period of counseling is required (*Id.*, 74).

The eligibility technician in charge of Vivian Woolfolk's case testified that she presented the case to the local welfare board for termination after Miss Woolfolk had failed on the appointed day to appear for employment for reasons which "didn't seem too valid." (Carson depos., 77). On Sunday, September 14, 1970, Miss Woolfolk's work was to commence. On Thursday, the 18th, she appeared at the welfare office and explained that she had had a sore throat on Sunday. No inquiry was made to determine whether the job offer was still open on Thursday. Nor was Miss Woolfolk informed that a cutoff of her benefits was being considered at that visit or at a subsequent one later on Thursday, when she reported with a doctor's certificate stating that she could work the next day. (*Id.*, 77–79). On Friday, September 19th, her case was closed by the welfare board, thereby terminating benefits to her and her child.

The Superintendent of the Bedford County Welfare Department was chiefly responsible for offering Miss Woolfolk an employment opportunity (Goode depos., 7). The job involved babysitting for one small child all day, responsibility for four others, aged eight through seventeen, from about 3:30 until 5:00 p. m., serving dinner, and washing dishes. The pay was $20.00 per week, plus five days' room and board. Miss Woolfolk would live in a house trailer on the property, and if she did not desire to bring her daughter, Helen, with her, the child would be left with her grandmother. To the superintendent's knowledge, Miss Woolfolk's prior work experience was restricted to babysitting (*Id.*, 13). The employment offer was made for that reason and on account of its proximity to Miss Woolfolk's home, in view of her lack of transportation (*Id.*, 41). It was made prior to any visit to the job site (*Id.*, 31) or examination of the living arrangements (*Id.*, 33).

It was the general practice of the Bedford welfare office to keep a list of available jobs on hand and to offer positions deemed suitable to welfare recipients (*Id.*, 27). No definable standards of suitability exist (*Id.*, 28). No job training is available to persons offered work rule jobs (*Id.*, 29). The ineligibility which flows from refusal to accept a job is considered "rather permanent." However, if one reapplies for benefits, the question of need is reexamined, and in practice aid will be granted if the job is not still available (*Id.*, 46–47).

The three Calloway plaintiffs, sisters, were offered the same job in the course of a single telephone call (Carson depos., 82). This was also a babysitting job, an opening for one person, involving caring for two small children at a home some fifteen to twenty miles distant from

the Calloway plaintiffs' residence (Carson depos., 82). When they each in turn declined the offer, on April 8, 1970, their cases were submitted to the welfare board; aid was terminated at the April 17th welfare board meeting. On May 12th, when the Calloways came to get food assistance from the welfare office, their AFDC cases were reopened after a telephone inquiry disclosed that the job was no longer open.

The local welfare office was aware from earlier unrelated contacts with the prospective employer of his general home situation. The procedure to determine the suitability of the employment was extremely informal in other respects as well:

Q. Is an accepted procedure in your office to offer jobs over the telephone?

A. No, we do not generally do it this way. The man had to have someone that day or was trying to find someone that day. We knew something about his home situation, and we knew the Calloway girls, and we felt that this was a job that one of them could do because one of them had said when she worked the other two would take care of her children. And this was the plan for each one; if one wouldn't go then we tried the others.

Q. To your knowledge was any counseling given to any of the Calloways after the Board made the determination to cut them off?

A. What type of counseling do you refer to?

Q. Counseling of the type referred to in the WIN manual, as to when someone refuses referral into the WIN program?

A. No, there was no counseling of this type given.

The 1967 amendments to the Social Security Act included the Work Incentive Program for AFDC recipients. The bill reported out by the House, like that which became law, established certain mandatory components of state AFDC plans. Prior efforts in the field of welfare-related work and training programs had been optional with the states. 42 U.S.C. §§ 607, 609.

The proposals sprang from a concern to curb the mounting numbers of AFDC recipients by assisting poverty-level families to economic independence, thereby reducing the federal financial participation in the program. H.R.Rep.No.544, 90th Cong., 1st Sess. 95–96 (1967). The House Committee noted that the goal of developing the full employment capacities of AFDC recipients could not easily be achieved, given the handicaps under which most such persons suffered:

> Your committee is well aware that this potential can be realized only with careful planning and with the development of appropriate training, educational, child care, and related resources on the part of the State and local welfare agency. *Id.*, 97.

The Senate committee substantially revised the House Bill; the principal change was to bring the administration of the Work Incentive Program under the Department of Labor and state employment commissions. Sen.Rep.No.318, 90th Cong. 1st Sess. 19–20 (1967); Sen. Rep.No.744, 90th Cong. 1st Sess., reprinted at 2 U.S.Code Cong. & Admin. News, 90th Cong. 1st Sess. 2834 (1967). In addition, the Senate bill incorporated specfic guidelines establishing those persons who would not be considered appropriate for referral for participation in the training and employment program. Sen.Rep.No. 744, *supra*, 2984.

The purpose of the legislation which emerged is set forth in the statute:

> The purpose of this part is to require the establishment of a program utilizing all available manpower services, including those authorized under other provisions of law, under which individuals receiving aid to families with dependent children will be furnished incentives, opportunities, and necessary services in order for (1) the employment of such individuals in the regular

economy, (2) the training of such individuals for work in the regular economy, and (3) the participation of such individuals in special work projects, thus restoring the families of such individuals to independence and useful roles in their communities. It is expected that the individuals participating in the program established under this part will acquire a sense of dignity, self-worth, and confidence which will flow from being recognized as a wage-earning member of society and that the example of a working adult in these families will have beneficial effects on the children in such families. 42 U.S.C. § 630.

The "incentives, opportunities, and necessary services" are set forth in considerable detail in the statute and regulations authorized thereunder. Entry into the program itself is governed by the state agency in charge of administering AFDC assistance; the state plan must include a referral procedure because the WIN program as a whole is not optional.

Under 42 U.S.C. § 602(a) (19) each "appropriate" AFDC recipient, each "appropriate" person whose needs are taken into account under the "essential person" provision, § 602(a) (7), and each volunteer for the program, must be referred promptly to the representative of the Secretary of Labor.[2] The order in which determinations of appropriateness are made is set out in regulations as well.[3]

For each individual referred to the WIN program, a program of testing and counseling is required in order to determine the person's suitability for a program leading to employment in the regular sector. 42 U.S.C. § 633(a).[4] Geared to the WIN program are the statutory requirements of family services and an employment program for each AFDC beneficiary, also added by the 1967 amendments, 42 U.S.C. §§ 602(a) (14), (15), 606(d), 625. In particular the employability program must assure that those referred to the WIN program be afforded child-care services, 42 U.S.C. § 602 (a) (15) (B) (i).[5]

2. As noted, statutory exceptions have been made. Thus one "so remote from any of the projects under the work incentive programs * * * that he cannot effectively participate," 42 U.S.C. § 602 (a) (19) (A) (v), or whose "presence in the home on a substantially continuous basis is required because of the illness or incapacity of another member of the household," 42 U.S.C. § 602(a) (19) (A) (vii), is not to be referred unless he volunteers. In addition, by regulation one whose "presence in the home is required because adequate child-care services cannot be furnished," 45 C.F.R. § 220.35(a) (2) (v), is exempt from mandatory referral.

3. Determinations as to whether individuals shall be referred under sub-paragraph (1) (i) and (ii) of this paragraph (a) for participation under a Work Incentive Program, will be made in the following order of priority:
   (i) (a) Unemployed fathers currently participating in a Work Experience and Training Program under Title V of the Economic Opportunity Act or who have participated in a Community Work and Training Program under section 409 of the Social Security Act; (b) Other unemployed fathers. (ii) Mothers and oth-

er caretaker relatives and essential persons who volunteer and are currently participating in a Title V Work Experience and Training Program or have participated in a Community Work and Training Program. (iii) Dependent children and essential persons age 16 or over who are not in school, at work, or in training, and for whom there are no educational plans under consideration for implementation within the next 3 months; (iv) Mothers and others who volunteer but are not currently involved in a Work Experience and Training program and who have no preschool children; (v) Mothers and others who volunteer and have preschool children; (vi) Any others determined by the State to be appropriate for referral. 45 C.F.R. § 220.35(a) (3).

4. In addition, for each "suitable" person referred to the manpower agency an employability plan describing the particular training required in order to enable that person to become self-supporting is to be developed. 42 U.S.C. § 633(b).

5. Both HEW and the Department of Labor have published extensive manuals of guidelines governing the incidents of the Work Incentive Program. The Labor manual, published by the agency in charge

Because the WIN program has coercive elements, extensive statutory safeguards have been provided. The welfare agency's decision that a recipient is appropriate for referral to the program is subject to examination in a fair hearing. 42 U.S.C. § 602(a) (4), 45 C.F.R. § 220.35(a) (15), Department of Health, Education and Welfare, Social and Rehabilitation Service, Guidelines for the Work Incentive Program (hereinafter HEW WIN Guidelines) § 42.

A second hearing may occur after referral; the issue here is whether the individual refused without good cause to participate in a WIN program or to accept a bona fide employment offer. This hearing is conducted by the representative of the Secretary of Labor. 42 U.S.C. § 633(g), 45 C.F.R. § 220.35(a) (16). Department of Labor, Manpower Administration, Work Incentive Program Handbook (hereinafter Labor WIN Handbook) § 412(H)–(K).

The statute provides specifically the sanctions which apply to those who are determined by the Secretary of Labor pursuant to § 633(g) to have refused without good cause to participate in a work incentive program or to accept an employment offer after referral. Sanctions apply only to those who are involuntarily referred. § 602(a) (19) (F), 45 C.F.R. § 220.35(a) (6) (ii). If good cause for refusal is lacking, the AFDC grant of the individual child or recipient who made such refusal terminates. 42 U.S.C. § 602(a) (19) (F) (i)–(iv). The cut in aid does not take place, however, for a period of 60 days, if during that time the individual accepts counseling designed to encourage him to resume participation, 42 U.S.C. § 602(a) (19) (F), 45 C.F.R. § 220.35(a) (8).

The legislation leaves substantial latitude to the states in determining who is "appropriate" for mandatory referral to the Work Incentive Program. By regulation, those subject to mandatory referral include, briefly, unemployed fathers (when included in the state's plan, which is not the case in Virginia) and dependent children over age 16 and not employed or attending school. 45 C.F.R. § 220.35 (a) (1) (iv), HEW WIN Guidelines § 41.1. Others may be included within the mandatory category at the state's option. The Virginia WIN regulations list as "appropriate" persons dependent youths, as required, and "mothers and other caretaker relatives who are not currently participating in a work or training program," Virginia Department of Welfare and Institutions, Manual of Procedure, Work Incentive Program (hereinafter DWI WIN Manual), § 201A.

Referral is to be prompt, *Id.*, § 204, as the statute and regulations require, 42 U.S.C. § 602(a) (19) (A), 45 C.F.R. § 220.35(a) (1) (iii), and is not to be postponed by reason of the lack of an existing WIN project to which the appropriate person can be assigned. 45 C.F.R. § 220.35(a) (1) (iii). These provisions apply to voluntary as well as to compulsory referrals.

Virginia's criteria of appropriateness for compulsory referral exclude from participation in the WIN program "a person living in such an isolated area, without transportation, that it would be infeasible for him to participate in the WIN program," DWI WIN Manual, §

of enrolling and training AFDC recipients, sets out in great detail the WIN program standards concerning enrollment, compensation, relocation, refusals to participate, job training hours, safety standards, and so forth; and describes the program operations, encompassing orientation, employability plans, testing, work and training components, job placement, and follow-up services. Department of Labor, Manpower Administration, Work Incentive Program Handbook, Sections 4, 5. An exhaustive account of these standards is not necessary. The reader should be aware, however, that formal rules govern nearly every aspect of the welfare recipient's relation to the program and that it is an elaborate program, consistent with the difficulty of the task undertaken. "[B]ecause it is implicit in the Social Security Act that WIN is to raise people above the poverty level, it is *not* the intent of the program to refer enrollees to low-paying jobs." *Id.*, § 516 (italics original).

203.1B. It should be kept in mind that regulations concerning appropriateness for the program relate only to compulsory referrals. Volunteers for WIN are to be referred despite a determination of inappropriateness unless the local welfare department finds that enrollment in the program would adversely affect child development and family cohesiveness, DWI WIN Manual, § 203.2. This is in accordance with federal law, 42 U.S.C. § 602(a) (19) (A) (iii).

Requirements that persons receiving public assistance accept available employment have historically been a part of welfare programs.[6] The Department of Health, Education and Welfare, while cautioning against the possible adverse consequences to family life of provisions requiring recipients of aid to families with dependent children to accept suitable jobs, has not ruled that they are in conflict with the Social Security Act. Department of Health, Education and Welfare, Handbook of Public Assistance Administration, pt. IV, § 3401.1.[7]

The 1967 Social Security amendments manifested a turnabout in federal attitudes toward employment programs in the AFDC context. Graham, Public Assistance: Congress and the Employable Mother, supra, n. 6, 228. The involvement in compulsory work programs at once became extensive; by federal statute and regulation numerous incidents of the recipient's relation to the agencies which channel him into employment are governed. The thrust of the congressional approach—comprehensive regulation of the relation between the state and the beneficiary, a full range of programs designed to be of substantial permanent benefit to the individual, specificity as to those activities which the recipient must undertake lest sanctions be imposed, and limitation of sanctions to particular classes of recipients—is inconsistent with the continued application, as in these cases, of a state work rule which attempts to relieve the burden of welfare costs and place the recipient in employment in an imprecise and summary fashion.

■ In so ruling, the Court emphasizes what questions are not being decided. The Court is not ruling that persons receiving assistance are without obligation to accept employment. Indeed the instant holding is based upon the compulsory work and training provisions in the federal legislation.

■ Moreover, this decision in no respect imposes new restrictions on the states' power to designate those who shall be deemed appropriate for compulsory referral to WIN. Beyond mandatory inclusions specified by regulation, the states appear to be free to classify as appropriate any groups included within the language of § 602(a) (19) (A) (i), (ii) and not excluded by § 602(a) (19) A (iv)–(vii).

Furthermore, the ruling is made in the light of statements at bar made by defense counsel, statements which are at least partially supported by the conclusions of the amicus brief, to the effect that the Virginia work rule is not intended to apply to those found appropriate for WIN or volunteering for it, and referred to that program. This is consistent with the testimony of Virginia's Chief of the Bureau of Assistance and Service Programs (Armstrong depos., 63).

The Court must note, however, that it is far from clear that the four named plaintiffs were found inappropriate for referral prior to the termination of their benefits pursuant to the Virginia work rule. The service worker responsible for

6. See Note, Compulsory Work for Welfare Recipients Under the Social Security Amendments of 1967, 4 Colum.J.L. & Soc. Prob. 197, 203–06 (1968); Graham, Public Assistance: Congress and the Employable Mother, 3 U.Richmond L.Rev. 223, 230 (1969); Note, Public Welfare "WIN" Program: Arm-Twisting Incentives, 117 U.Pa.L.Rev. 1062, 1067 n. 43 (1969).

7. See Note, Welfare's "Condition X," 76 Y.L.J. 1222, 1230–31 (1967); Note, Federal Judicial Review of State Welfare Practices, 67 Colum.L.Rev. 84, 88–89 (1967).

considering Vivian Woolfolk's suitability for WIN never concluded that she was inappropriate and in fact never finished her evaluation. (Martin depos., 94). The process was interrupted when the service worker's supervisor informed her that a job possibility had appeared for Miss Woolfolk (*Id.*, 98); nothing further was done after AFDC was cut off (*Id.*, 101). The same service worker testified concerning the Calloway sisters that she was attempting to relocate some or all of them to a residence in Goode so that they would be more accessible to employment or training under WIN at the time the job opportunity arose (*Id.*, 105). She recognized that their remoteness presented a problem, but still contemplated giving a mental examination to further determine suitability (*Id.*, 107). Aid termination ended these efforts. Curiously, the files of the local welfare department for each Calloway sister contain copies of form MA–101, the initial information record completed after an individual is referred to a manpower agency. United States Department of Labor, Manpower Administration, WIN Information System Manual, § 3.1.2 (1970). The forms indicate that each of the sisters was referred by the welfare agency under category six, "AFDC mothers and others who volunteer and who have no pre-school children," *Id.* These forms were dated November 17, 1969. The files further indicate that the welfare department became aware that they had been filled out soon after their completion. Despite that the sisters were considered by the WIN component to be in a "holding" status on April 8, 1970, the work rule was nevertheless applied to each and their grants were terminated.

■ In any event, the defendants concede, as stated, that § 211.4E and F have no impact on people referred to WIN. This position is correct legally, for Congress certainly cannot have intended that those in WIN programs be subject to precipitous termination of their training activities or preparation for employment whenever the welfare agency located "suitable" employment.

Such a frustration of the federal program would occur if the WIN and work rule provisions applied at the same time to the same people. The rights to testing, counseling, and employability plan granted by federal law, and the rights to participate in training programs established under the act would be nullified. Moreover the right to be subjected only to the sanction of denial of benefits attributable to the single individual who declines to participate, after a hearing and review conducted by the manpower agency, would be denied. When a state rule otherwise would nullify rights granted by federal law and stymie the operation of a federal program, it must yield. Cf. Colorado Anti-Discrimination Commission v. Continental Airlines, 372 U.S. 714, 83 S.Ct. 1022, 10 L.Ed.2d 84 (1963). State legislation which effectively denies welfare recipients "the very benefaction the [federal] act was intended to bestow," Shepheard v. Godwin, 280 F.Supp. 869 (E.D.Va.1968), cedes under the supremacy clause to the federal statute.

■ The decision that the federal scheme ousted any state power to enforce a regulation governing acceptance of employment against those referred to WIN necessarily leads to the conclusion that those found inappropriate for WIN are also immune from such a rule; for to hold to the contrary would frustrate still another aspect of the federal scheme. The WIN statute and regulations provide that, despite a finding of inappropriateness under the state's standards, a welfare recipient may volunteer for the program, and that such applicants must be promptly referred and enrolled. Referral may be denied a volunteer only on grounds related to the health of the family structure. It is no justification for non-referral, for example, that child care is not currently sufficient or that the individual is too remote from the site of a WIN project in the opinion of welfare officials. Once enrolled, the volunteer is at liberty to withdraw, too, without fear of the sanctions which apply to compulsorily referred persons.

If the defendants' position, that the Virginia work rule does not cover WIN participants but that it may nonetheless be applied to those found inappropriate by the local welfare departments, were accepted, an illogical situation would exist; for it must nonetheless be a simple matter for an AFDC recipient to avoid the impact of the state rule. Those found inappropriate could simply request referral to WIN in order to obtain the benefits of the protection, congressionally created, from the sanction of termination of aid. If the statutory plan to define and limit the sanctions applicable to those involuntarily referred as "appropriate" for WIN bars imposing overlapping state requirements with broader sanctions, it is inconceivable that such a state rule might apply to persons whom Congress decided should be subject to no penalties at all.

Legislative history coincides with this conclusion. The Senate Finance Committee report envisioned no compulsory work or training for those required, under the statute, to be found inappropriate.

> To provide guidelines and to clarify the manner in which the program will operate, the committee bill sets forth a number of categories of individuals who would not be considered as "appropriate" for referral to the Secretary of Labor for the work incentive program. Persons described in those categories would not be placed in any work situation unless they chose to request employment or training. Sen. Rep.No.744, *supra*, 2984.

This conclusion is consistent as well with the tenor of the floor discussions of the legislation in the Senate. Senator Long introduced and explained the bill, which at the time included a provision describing as exempt from referral those whose participation the state found would not be in their interest or that of the program. This latter proviso was later deleted as redundant, apparently because the state could establish the definition of those appropriate in any event. Senator Long interpreted the language defining appropriate persons as follows:

> The Senate committee feels work should not be required as a condition of drawing welfare payments as to certain people. We spell out those people we think should not be required to go to work. We say to the states, "If you want to, go ahead and put some other provisions in here with respect to people whom you do not think should be required to go to work." * * * Thus, having challenged the imagination of the states as well as that of the committee, we ask the question, "Can you tell if there is any other sufficient reason why an individual should not do something and help society as a condition to receiving welfare money?" 113 Cong.Rec. 32593 (1967).

He stressed as well the provision guaranteeing protective and vendor payments for the benefit of dependent children whose parents refuse employment, grants which the Senate bill included "to protect dependent children from the faults of others," *Id.*, 32593. Senator Ribicoff remarked immediately thereafter that "The Senate bill wisely identifies certain groups of people who ought not to be considered in the pool of those automatically considered appropriate for training or work experience," *Id.*, 32852.

Extensive floor discussion concerning an amendment offered by the late Senator Kennedy of New York reflected the legislators' conception of a statutory exemption from compulsory referral to WIN, *Id.*, 33540–45. The amendment would have exempted most mothers of school age children. The discussion of its impact, even allowing for the imprecision of spoken words, discloses that both proponents and opponents of the measure conceived of the legislation which became 42 U.S.C. § 602(a) (19) (A) (iv)–(vii) as setting down exemptions from any mandatory employment or job training in exchange for AFDC

benefits. Senator Kennedy spoke of the bill and his own proposal:

> As the legislation reads at the present time, we have accepted the idea that a mother with preschool children should remain at home and that the mother should not be forced to work under those conditions * - * *
>
> My amendment accepts the idea that while children are in school, the mother can work during that period of time; but when the children are out of school, or on vacation, or during the summer, the mother, it seems to me should remain at home to take care of the children. *Id.*, 33541.

Senator Long opposed the alteration, arguing, among other points, that the bill which he supported would demand that whenever work was required child care would be provided and that the child's share of the welfare allotment would be paid even if the employment were rejected. *Id.*, 33542. Only on these terms, with WIN benefits and limited sanctions, would a work requirement be enforced. Moreover, Senator Long argued, the states were free to exempt whomever they wished, including mothers of school age children. He continued:

> However, I cannot support an amendment that would provide that a State could not have an effective work program, even if it wanted to.
>
> We are urged to fix it up by Federal fiat so that even if a State wanted to have an effective work program, it could not have it * * *. *Id.*, 33543.
>
> Under the Senator's amendment, if the State of Maine wanted to set up a program to look after that child from 6 in the morning until 6 in the evening, with all the elaborate care and professional Hollywood help that can be recruited to show them a good time, under the Senator's amendment, we could not ask [the mother] to go to work or forfeit her welfare check * * *. *Id.*, 33544.
>
> Mr. President, I should like to make this clear. Under this provision, we say, by Federal law, that a State shall not require any mother to go to work as a condition of receiving welfare payments for both herself and her child.
>
> We were unanimous about this. We set down every logical reason that occurred to us why a mother should not be expected to do anything but help herself and the child. We go further and say that when the State wants to find some additional reason why it is not in the interest of the child for the mother to go to work, the State can do so.
>
> If the government of New York feels this way, it will negate the program, anyway, and New York will not have an effective work program. But under the proposal of the Senator from New York, New York could not have an effective work program, even if the legislature and the Governor wanted to have one. *Id.* 33545.

Proponents as well as opponents ascribed such an effect to the bill and the proposed amendment. See the remarks of Senator Javits, *Id.*, 33543, and of Senator Muskie, *Id.*, 33543–44.

Subsequent discussion of the bill after it emerged from conference also reflected the legislative consensus that the statutory class of persons not mandatorily referable constituted a group of recipients who were not subject to termination of benefits for failure to accept work or training. See the remarks of Senator Young, *Id.*, 36775; of Senator McCarthy, *Id.*, 36775–76; of Senator Case, *Id.*, 36794; of Senator Javits, *Id.*, 36796; and of Senator Robert Kennedy, *Id.*, 36784–85. The latter senator, criticizing the mandatory work legislation, adverted to the "employable mother" eligibility rules applied by some states under existing law: "This rule is being challenged in litigation," he said, "but the provisions of the conference bill on compulsory work and training imply that from now on the 'employable mother' rule would be sanctioned by a national policy." *Id.*, 36788.

In reply to critics of the compulsory work provisions, Senator Smathers point-

ed out expressly that such requirements have long been included in state welfare plans, and the idea itself was no innovation, but that under the proposed legislation such state regulations could not conflict with the WIN provisions:

> What the opponents of the provisions in that bill do not realize is that the States are now allowed to cut off a family's welfare payment if a parent refuses to work or refuses to take training. And, many states are doing just that. For example, in New York State when a father refuses work without good cause they cut off aid to the whole family. And New York does that every day. Under the bill, New York State will have to continue aid to the children in such cases. For the first time there will be restrictions on the states. How can anyone characterize such a provision as regressive? *Id.*, 36912.

The Congressional conception of this aspect of the act passed is therefore quite clear, at least in comparison with the provisions interpreted, for instance, in Rosado v. Wyman, *supra.* The legislators debated and decided upon certain federal rules establishing certain groups as not subject to referral for compulsory work or training not so much on the basis of the likelihood that such persons would not be suitable for training in the programs created by federal legislation or would not benefit therefrom, but on the basis that such persons ought not to be removed from the home situation for any purposes. Classification as inappropriate for referral to WIN, moreover, was conceived as conferring an exemption from any requirement that a person assume employment responsibilities or accept training in return for AFDC.

■ This conception is reflected in the statute which emerged. It would make little sense for Congress so extensively to describe the class of persons subject to sanctions for refusal to accept training or employment (which employment, of course, includes job opportunities in the private sector) and to define in detail the sanctions available, if the legislation might be nullified by state rules exposing additional persons to compulsory employment and imposing additional sanctions on recipients for failure to accept work. The Court concludes therefore that, as applied to AFDC recipients and persons whose needs are taken into account in determining overall needs, who are residents of areas where the work incentive program is in effect, the Virginia work rule is invalid for inconsistency with federal law.

A question remains whether there are some individuals in the plaintiff class to whom the state work rule may be applied by reason of the limited development of the Work Incentive Program. The statute directs the Secretary of Labor to establish WIN programs.

> * * * in each State and in each political subdivision of a State in which he determines there is a significant number of individuals who have attained age 16 and are receiving aid to families with dependent children. In other political subdivisions, he shall use his best efforts to provide such programs either within such subdivisions or through the provision of transportation for such persons to political subdivisions of the State in which such programs are established. 42 U.S.C. § 632(a).

Section 632(b) requires that all such programs include three elements—employment, training, and special work projects.

The Department of Labor criteria apparently defining the statutory "significant number," classify any county with at least 1100 AFDC and AFDC-Unemployed Fathers recipients eligible for referral to be "eligible to operate a WIN program within its boundaries." Labor WIN Handbook § 403(B) (2). Where under 1100 reside in the county, the area "may operate a local program at the discretion of the Secretary of Labor under the 'best efforts' clause," Labor WIN Handbook § 403(B) (3). Pertinent in determining whether a program should operate in the latter type of area is the area's "proximity to existing WIN pro-

grams," *Id.*, presumably a factor in considering whether to transport WIN participants to a program in another political subdivision as an alternative to the creation of a second program in their home area.

Principally from these statutory geographic limitations, it is apparent that the WIN program is, as the Government's brief says, not all-inclusive, in that Congress envisioned that there would be some counties within which no functioning WIN program would be placed. Still the question is whether the work rule and its sanctions are therefore enforceable against some or all residents of such areas.

Legislative history discloses an expectation that, in view of the mandatory and "best efforts" requirements to commence local programs, together with the provision of transportation, WIN programs would be available for nearly all who were referred. Sen.Rep.No.744, *supra*, 2984–85.

Despite that § 632 contemplates that WIN programs will exist in fewer than all political subdivisions, the statutes governing participation do not appear to make any blanket exemption from mandatory referral for residents of areas where WIN is not operating. Instead the law says that an individual shall not be mandatorily referred if he is

> so remote from any of the projects under the work incentive programs * * * that he cannot effectively participate under any of such programs. 42 U.S.C. § 602(a) (19) (A) (v).

This language seems to require a specific, individual finding by the welfare authorities that a given individual is inappropriate by reason of his location rather than the application of a general rule covering all in a certain area. Indeed the provision would seem to allow a finding that a resident of an area containing a WIN program was nonetheless too distant from it for mandatory referral, and it would be strange to give the language a different construction, calling for other

than case-by-case consideration, in another context.

Regulations implementing the WIN legislation also contemplate referral by the welfare agency of persons residing outside the political subdivision where the program operates. Multi-county projects are allowed, Labor WIN Manual, § 300(B) (3). In discussing the "remoteness" exemption from referral, the Labor guidelines state explicitly that "where necessary, arrangements can be made for a person to participate in a project in another county or another state," Labor WIN Manual, § 405(B) (2). The HEW regulations likewise call on the local welfare agencies, before classifying a recipient as inappropriate for remoteness, to call upon its "knowledge of the locations of the various projects under the State's Work Incentive Program." HEW WIN Guidelines § 41.3 (b).

In sum, both administrative agencies construe the statute, in some of their regulations at least, to allow referrals across county lines unless the program site is too remote from the participant's home. This is not to say that there are no regulations inconsistent with such a rule. See, e. g., 45 C.F.R. § 220.35(a) (1) (iii), defining referral to WIN as the transmission of notice of a finding of appropriateness "in as area where a Work Incentive Program is operated," *Id.*; see also, HEW WIN Guidelines §§ 41.1, 61.1, 91. The statute, by contrast, requires the referral of "each appropriate child and relative" over age 16 and receiving AFDC, 42 U.S.C. § 602(a) (19) (A) (i). Other regulations are ambivalent; one speaks both in terms of "[w]here there is a Work Incentive Program," and "those locations where there is *no access* to a Work Incentive Program," HEW WIN Guidelines § 62 (emphasis supplied). Additionally, both Labor and HEW contemplate referral of unemployed fathers to state employment service offices rather than WIN programs in certain instances, HEW WIN Guidelines § 62, Labor WIN Manual § 405(C), despite the direction of 42 U.S.C.

§ 607.[8] But see 45 C.F.R. § 233.100(a) (6), requiring referral to WIN.

■■ The interpretation of the statute by those in charge of its administration is thus somewhat ambivalent. Agency interpretations cannot override the congressional purpose of course, King v. Smith, 392 U.S. 309, 333 n. 34, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), but they often afford a court valuable guidance because they constitute views formed, presumably, by officials duty bound to explore the effect of their construction on the entire statutory plan. Here the administrative rulings offer no real help, nor has the Government's amicus curiae brief taken a firm position. The Court must construe the law on the basis of the congressional purpose discernible from the statute and legislative history.

Plainly § 632(a), in directing the Secretary of Labor to use his best efforts to transport appropriate persons to WIN programs outside their area of residence, signifies that persons not within so-called WIN areas are to be considered for referral to the program. Section 602(a) (19) (A) directs the referral of each appropriate AFDC beneficiary and makes an exception for cases where the state welfare agency determines that a person is in fact located too far from a program to take part. The Senate Report, perhaps overly optimistically, expressed the hope that such a scheme would make WIN available to most recipients. The only sensible construction of the legislative plan is that, wherever situated, all AFDC beneficiaries have a right to be considered for referral to WIN and to be found either appropriate or inappropriate by the local welfare agency.

The House Report as well envisions a comprehensive training program, required by statute to be made available to most AFDC recipients, and foresees

the review of each recipient's case to determine whether he should participate:

> The objective is to have the program available in all the localities with enough recipients to make the project feasible. It may be possible for the State to arrange for smaller communities to be joined so that the appropriate size group will be available * * *.

> Your committee intends that a *proper evaluation be made of the situation of all mothers* to ascertain the extent to which appropriate child care arrangements should be made available so the mother can go to work * * *.

> Children over the age of 16 are expected to be participants in the program if they are not in school and it is otherwise found appropriate, under standards of the Secretary, that they receive this kind of experience. *All adults in AFDC families, and children, as described above, are expected to be considered for participation in this program.* H.R.Rep. No. 544, *supra,* 104–105 (emphasis supplied).

The express legislative intent, then, is that consideration of the appropriateness of a particular person for referral will not be barred on the ground of his location; rather location is one of the factors which the welfare agency weighs in determining appropriateness.

When the WIN program has been developed more slowly than the legislators hoped, or the project locations are unwisely chosen, large numbers of AFDC recipients would be inappropriate for remoteness, and should be so found. Consistent with the congressional intention revealed in the legislative history discussed above, such persons are not to be forced, under the threat of sanctions at variance with those imposed for failure to participate in WIN, to enter employment or work training programs.

---

8. Where the unemployed father provisions are adopted, the state plan must provide: "for such assurances as will satisfy the Secretary that fathers of dependent children as defined in subsection (a) of this section will be referred to the Secretary of Labor as provided in section 602(a) (19) of this title within thirty days after receipt of aid with respect to such children." 42 U.S.C. § 607(b) (2) (A).

Congress has endorsed the use of the threat of termination of subsistence level support as a means of forcing the acceptance of training or employment only when the job or the training meets specific federal requirements. State rules seeking roughly similar ends but differing sharply in means cannot coexist.

This interpretation is buttressed by Congress' provision of the opportunity to volunteer for participation in WIN for persons found, for one reason or another, inappropriate for mandatory referral. The only ground on which their participation may be denied is that referral would be "inimical to the welfare of such person or the family," 42 U.S.C. § 602(a) (19) (A) (iii); see Sen.Rep. No. 744, *supra,* 2984. The right of access to WIN for these persons carries with it the right of immunity from the sanctions of § 602(a) (19) (F). This is a substantial right. Congress, having determined that such persons were not to be forced to participate in WIN by the federal statutory sanction, scarcely can be considered to have intended to permit parallel state sanctions to operate against volunteers. Much less can Congress be taken to have permitted the use of a state work rule to compel inappropriate persons to volunteer for WIN. The operation of the work rule against persons, wherever situated, to be considered for WIN participation is illegal.

Some other legislative scheme might better have further reduced the ranks of government dependents, or been more economical, or actually benefited more recipients. But it is not for this Court or for Virginia to rewrite the federal legislation. We must deal with finished legislative products and apply them to the facts. If the outcome is not what Congress still desires, Congress may withdraw its mandate. The Court merely notes that to the extent that the achievements anticipated in the committee reports have not been forthcoming and the passage of AFDC beneficiaries to self-supporting status has been frustrated by the unavailability of sanctions such as Virginia has attempted to apply, such result is at least partially attributable to the limited development of the WIN programs to date.

The complaint alleges faults as well in the state's fair hearing procedures. Although the evidence disclosed what may well have been practices inconsistent with Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the plaintiffs have not pursued this issue. Recent federal regulations require the continuation of aid during appeal, 45 C.F.R. § 205.10, and Virginia has followed suit, Bulletin No. 513, Virginia Manual of Policy and Procedure for Local Welfare Departments, July 24, 1970. The result of this decision is that the provision of Virginia's work rule, to the extent that it allows termination of aid for noncompliance with its terms, may not be applied; a fortiori it cannot be applied to cut off funds before a fair hearing. For all purposes, too, the state now requires continuation of assistance during review. The issue is either resolved by other relief granted herein or rendered moot, and declaratory and injunctive relief will therefore be denied.

Orders shall enter consistent with this opinion.