Lydia **AGUAYO** et al., Appellants-Plaintiffs,

v.

Elliot R. **RICHARDSON**, Secretary of the United States Department of Health, Education and Welfare, et al., Appellees-Defendants.

Nos. 479, 508, Dockets 72-2195, 72-2243.

United States Court of Appeals, Second Circuit.

Argued Dec. 1, 1972.

Decided Jan. 18, 1973.

Joseph P. Marro, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty. for the S. D. N. Y., Jerome T. Levy, and Thomas Scarlett, Department of Health, Education and Welfare, of counsel), for the Federal appellees.

Amy Juviler, Asst. Atty. Gen. (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hirshowitz, First Asst. Atty. Gen. and Constance B. Margolin, Law Apprentice, New York City, of counsel), for appellees Lavine and New York State Dept. of Social Services.

Robert J. Egan, Marion P. Ames, New York City, and Mildred A. Shanley, Middle Village, N. Y., of counsel, for various civic and social organizations appearing as amici curiae in support of the contentions of appellants-plaintiffs.

Before FRIENDLY, Chief Judge, and WATERMAN and HAYS, Circuit Judges.

FRIENDLY, Chief Judge:

This appeal is from an order of Judge Bauman in the District Court for the Southern District of New York, 352 F. Supp. 462, denying a preliminary injunction in an action by three sets of plaintiffs to enjoin the New York State Commissioner of Social Services and the State Department of Social Services (NYSDSS) from carrying out two experimental work project programs for employable members of families receiving assistance under the partially federally funded Aid to Families with Dependent Children (AFDC) program and to set aside the approval of the programs by the Secretary of Health, Education and Welfare under the demonstration project provision of the Social Security Act, 42 U.S.C. § 1315. The three sets of plaintiffs are: six women who might be required to take employment under the projects, suing individually, on behalf of their minor children and of other persons similarly situated; the City of New York and Jule Sugarman, Commissioner of its Department of Social Services, both of whom will have roles in administering the projects; and seven welfare rights organizations.

Adele M. Blong, New York City (Steven J. Cole, Henry A. Freedman, and NLSP Center on Social Welfare Policy and Law, Inc., New York City, of counsel), for appellants Aguayo, and others and Upstate Welfare Rights Organization, and others.

Paula Omansky, New York City (Norman Redlich, Corp. Counsel, City of New York, of counsel), for appellants City of New York and Jule Sugarman.

There are two sets of defendants. One, the federal defendants, comprises the Secretary of Health, Education and Welfare (HEW), the Administrator of its Social and Rehabilitation Service; its Regional Commissioner; and the Department itself. The other set, the state defendants, includes New York's Commissioner of Social Services and the Department of Social Services.[1]

## I. *The Nature of the Two Projects.*

The two projects, known as Public Service Work Opportunities Project (PSWOP) and Incentives for Independence (IFI), were formulated by the State Department of Social Services and approved by HEW for one year.[2] The State envisions PSWOP as providing public service work opportunities for those AFDC recipients who are able to work but for whom regular employment, training or public service employment has not been available or appropriate. Approximately 25% of the State's AFDC cases, comprising those recipients living in fourteen welfare districts in New York City, two counties in the metropolitan area surrounding the City, three upstate urban areas and six counties in the rest of the state, are to be included in PSWOP.

The local departments of social services in PSWOP districts must see to it that employable recipients[3] of AFDC

benefits register with the appropriate office of the New York State Employment Service. Semi-monthly interviews are to be scheduled for the recipients with employment counselors so that an employment plan, for a private sector job, training, public service employment (in IFI districts only), or a PSWOP job, can be developed. If the state employment service is unable to find other employment or a training program within thirty days, assignment of the recipient to a PSWOP job becomes mandatory. PSWOP employ can involve work for any state, city, town or village agency or school district located in the county. Broadly speaking, the work will be of the sort which, because of budgetary problems or otherwise, would not be undertaken except for PSWOP; workers in the program are not to displace those who would otherwise be employed.

No individual will be required to participate in PSWOP unless satisfactory child-care arrangements can be developed, and each case must be assessed to determine adequacy, although the state requires that "[d]iligent efforts . . . be made by [the recipient] and the social services district to obtain child care services or the assistance of others to provide such care." Public Service Work Opportunities Project (for ADC and ADC–U Recipients) Policy and Procedures, at 3 [hereinafter PSWOP Policy and Procedures].

---

1. In light of the naming of the individual defendants we have no occasion to consider the propriety of the unnecessary joinder of the Department of HEW and the New York State Department of Social Services.

2. Statutory authorization for IFI's development and its submission to HEW can be found in N.Y.Soc.Serv.Law § 29–a (McKinney's Consol.Laws, c. 55 Supp. 1972). The statutory basis for PSWOP is less clear. The state seems to rely on id. § 350–k, subd. 1, see PSWOP Policy and Procedures, at 1, even though that section provides for what seems to be a statewide program. But since the question of state authorization has not been raised, and because we cannot say that legislative approval of a statewide program does not include the power to es-

tablish demonstration projects, we will join the parties in assuming that PSWOP has been properly established by the State.

3. But for two additional exemptions, employability for purposes of PSWOP is defined by N.Y.Social Serv.Law § 131, subd. 4 (McKinney Supp.1972), which closely parallels the standards set out in the federal work incentive (WIN) program. Compare 42 U.S.C. § 602(a)(19) (A). Also exempt from PSWOP are: (1) mothers or relatives caring for children under 6 years old; and (2) mothers or female caretakers of children if the father or other adult male relative in the home is registered. However, any exempt recipient may register on a voluntary basis.

PSWOP workers will not receive earnings over and above their welfare benefits. The number of hours to be worked will be determined by dividing the amount of the participant's grant by the hourly wage to be received, but in no case will an individual be required to work more than eight hours a day or forty hours a week. The hourly rate will be the state minimum wage or the wage paid to employees for comparable work in the unit of government in which the project is conducted, whichever is higher. Participants will be reimbursed for lunch and transportation costs, and all work-related expenses incident to participation are to be paid "so that no recipient will incur any actual net reduction in income due to such participation." HEW Action Memorandum (re PSWOP), May 31, 1972, at 5.[4] Participants will also be covered by workmen's compensation. See N.Y.Soc.Serv. Law § 350k-3(d).

Failure to accept a justifiable referral or to participate properly after such a referral "without good cause" is a ground for termination of assistance, 18 N.Y.C.R.R. § 385.6. Upon request a fair hearing must be granted prior to termination, but if the recipient has not accepted the referral or has not continued to participate in the program and then receives an adverse determination at the hearing, a thirty-day suspension of benefits is mandated even though the recipient agrees to immediate compliance. See 18 N.Y.C.R.R. § 385.7.

The Incentives for Independence (IFI) demonstration project has four components: (1) a combination of two public service employment programs—PSWOP and the Emergency Employment Act (EEA) Public Service Employment Program—for adults unable to find regular employment; (2) an earnings exemption; (3) work motivation for school youth through participation in community work projects; and (4) a counseling service for the parents or caretakers of truant children. The project covers approximately 2.5% of the state's AFDC and Home Relief[5] recipients and will be conducted in three areas—a welfare center in New York City (Bay Ridge), a suburban county (Rockland), and a rural county (Franklin)—all of which are contained in or are coextensive with areas in which PSWOP will function.

As with PSWOP, all nonworking employable recipients will be required to participate in counseling, to report for job interviews and to accept work or training if offered, and no recipient will be considered employable unless a satisfactory child-care plan is available. Individuals in IFI districts can be as-

4. The appellants argue that the State program will not in fact reimburse the participant for all work-related expenses. They contend, for example, that the State will not pay for additional cold-weather or personal grooming items required because of the need to go to work. Although the State's PSWOP Policy and Procedures at 8, does not clearly delineate the types of expenses for which reimbursement will be granted, the State must make provision for payment of "any expenses reasonably related to the earning of income," since HEW has not explicitly or impliedly waived § 402(a)(7) of the Social Security Act, 42 U.S.C. § 602(a)(7), for the PSWOP program. See HEW Handbook of Public Assistance Administration, pt. IV, § 3140.1 (1964); cf. Connecticut State Dep't of Public Welfare v. HEW, 448 F.2d 209, 216–17 (2 Cir. 1971).

Appellants also contend that the State Dep't of Social Services, Administrative Letter 72 PWD–121, Aug. 10, 1972, limits the allowance for lunch expenses to $1.00 per day and the monthly allowance for transportation and lunches to $40.00 per month. But the letter seems to have been addressed only to changes in public work projects for employable Home Relief recipients and not to PSWOP or IFI. See 18 N.Y.C.R.R. § 385.10(a), (e)(5); n. 5 infra.

5. Home Relief is a state program of public welfare for families not eligible for federally funded assistance. See N.Y.Soc. Serv.Law §§ 157–58 (McKinney Supp. 1972). There is no indication that the appellants are attacking that part of the IFI program which affects Home Relief recipients.

signed to PSWOP jobs if employment or training programs in the regular economy are unavailable, and their work obligations and benefits will be identical to those of other individuals in PSWOP programs, except that the sanction for noncompliance in IFI districts is a flat $66 per month reduction in assistance until the individual complies. A limited number of recipients in IFI districts, however, will be assigned to "public service employment" jobs, subsidized by EEA funds, which will pay the higher of the minimum wage or the prevailing wage for persons in similar public occupations. Unlike PSWOP workers, employees in public service employment will work full-time and be paid full wages. Participants will receive workmen's compensation, health insurance, unemployment insurance, and all other fringe benefits conferred on employees of the same employer; their work conditions and promotional opportunities will also be the same as those of regular employees.

A certain portion of the wages paid in these public service employment jobs will be ignored when determining the recipient's eligibility for a supplementary welfare assistance grant. This "income disregard," which differs from that normally mandated by the federal government for AFDC recipients in regular employment, see § 402(a)(7), (8) of the Social Security Act, 42 U.S.C. § 602(a) (7), (8), by lowering the income level at

which supplementary assistance payments terminate,[6] will be applied in IFI districts to all AFDC and Home Relief recipients in public service employment or in regular employment.[7]

Furthermore, the children of families receiving AFDC or Home Relief in IFI districts who are 15 years of age and attending school full-time (and are not otherwise ineligible)[8] are required to participate in "Work Motivation for Youth." This program will require the child to work for up to six hours semimonthly during the school year and up to sixty hours during the summer vacation. Participants will be paid $1.60 per hour for no more than 150 hours per year. Refusal to comply will result in a $6.25 semi-monthly reduction in the family grant, unless the parent certifies that he or she is trying to get the child to cooperate. Also, when a child fails regularly to attend school, the parent or caretaker in a family receiving assistance must accept counseling services or face a reduction in the grant.

II. *The Processing of the Projects by the HEW, and the Proceedings in this action.*

The New York legislature originally provided for a work relief program for AFDC recipients in April 1971. See N.Y.Soc.Serv.Law § 350-k (McKinney Supp.1972). In a letter written soon after enactment to George K. Wyman, then Commissioner of the State Depart-

6. Under the federal formula, the first $30 per month of income earned in regular employment and one-third of the balance are exempt. All expenses incident to employment are then also disregarded. Under the IFI formula, the cost of day care is exempted as is the first $60 per month of expenses: one-third of the remainder up to 150% of the federal payments level is then exempted, and one-quarter is exempted thereafter. The IFI formula will generally yield smaller exemptions because under the federal formula (1) *all* expenses incident to employment are exempted, (2) the one-third exemption is uniformly applied to the balance, and (3) the exemption for expenses incidental to employment is taken *after* one-third of the gross income has

been exempted. See Connecticut State Dep't of Public Welfare v. HEW, 448 F. 2d 209, 214–15 (2 Cir. 1971).

7. Currently employed AFDC recipients in IFI districts will not be subject to the revised income disregard.

Under existing state law, there is a $30 per month income disregard for Home Relief recipients. N.Y.Soc.Serv.Law § 159–b (McKinney Supp.1972). Home Relief recipients in IFI districts will benefit from an increased income disregard. See n. 6 *supra*.

8. The child would not be eligible if, for example, he or she were required to participate in a supplementary or remedial educational program or were required at home for family care.

ment of Social Services, HEW stated that the work program was inconsistent with several federal requirements and could not receive federal funds. In August 1971, following discussions with President Nixon on welfare reform, Governor Rockefeller announced that New York would seek approval from HEW under § 1115 of the Social Security Act, 42 U.S.C. § 1315,[9] for an experimental work relief project, thus permitting a temporary waiver of certain federal requirements. New York submitted formal applications for the PSWOP and IFI projects on September 9 and 10, 1971, which were then revised and resubmitted on November 11, 1971.

On November 24, 1971, HEW approved both projects, contingent, however, on submission by New York of further information before December 31, 1971. The conditions called for revised and more detailed budgets, further information on personnel administration, and, with respect to IFI, requests for further waivers and rather extensive additional information on proposed implementation, including "a plan for general project activities (screening, referral, monitoring, etc.)." New York forwarded on December 28, 1971, letters not appearing in the record, which purported to meet HEW's conditions. On February 9 and 10, 1972, HEW responded, finding many of the budgetary specifications to be inadequate and requiring complete budgetary submissions as well as additional information on numerous operational aspects "prior to implementing the project." State officials, on February 22, 1972, provided HEW with two two-page letters responsive to some but—particularly as to IFI—not all of HEW's requests. The letters requested permission to begin implementation April 1, 1972.

Before any HEW responses, the District Court for the District of Columbia, enforcing an agreement between HEW and the National Welfare Rights Organization in settlement of an earlier suit brought under the Freedom of Information Act, on March 13, 1972, required HEW to withdraw its November 24, 1971, approval and to allow the Center on Social Welfare Policy and Law thirty days to examine the proposed projects and present an analysis to HEW.[10] On April 11, 1972, the Center sent HEW and NYSDSS an extensive letter prepared by Adele Blong, who has given the individual and organization plaintiffs superb representation, analyzing what it considered the defects of IFI and PSWOP and urging HEW not to authorize the programs. NYSDSS responded in two undated letters to HEW, one identifying the many objections raised by the Center and the other seeking to answer them.

Without having received further information from New York, the HEW staff prepared "Action Memoranda" which were presented to the Secretary on May 31, 1972, recommending approval of the projects but detailing certain necessary information still lacking from New York. On June 1, 1972, the Secretary approved the application for section 1115 demonstration projects, but again required further information prior to implementing each project. The further information requested included, *inter alia*, evidence of the availability of child care facilities, details of the fair hearing procedures to be used, and a statement that all work-related expenses would be reimbursed. On June 14 and

---

9. In the case of any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives of . . part A of subchapter IV of this chapter [the AFDC program], in a State or States—

 (a) the Secretary may waive compliance with any of the requirements of

section . . . 602 . . . of this title, as the case may be, to the extent and for the period he finds necessary to enable such State or States to carry out such project . . . .

10. National Welfare Rights Organization v. Richardson (Civ. 2178–71, D.D.C. March 13, 1972).

27, 1972, the State sent letters containing assurances of compliance and information concerning, respectively, PSWOP and IFI. Two weeks later, apparently without further official communication between HEW and NYSDSS, the state officials notified local welfare agencies to begin implementation of the projects on August 1, 1972.

The complaint herein was filed on August 2, 1972. Upon application by the plaintiffs, the district court, on August 4, issued an order temporarily suspending the HEW's approval of the projects to the extent that it permitted imposition of loss of benefits as a sanction and restraining the state defendants from imposing any sanction for nonparticipation; at the hearing Judge Bauman extended the stay pending resolution of the motion for a preliminary injunction.[11] On October 16 the court rendered an opinion. Judge Bauman held that the welfare organizations lacked standing and that the City of New York (and implicitly also Commissioner Sugarman) had standing to raise only what are hereafter referred to as the statutory claims. He found that all claims of constitutional violation were insubstantial, that federal jurisdiction nevertheless existed by virtue of § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, but that the statutory claims had not been shown to be meritorious. Accordingly, he denied the motion for a temporary injunction. Another panel of this court denied a further stay, except for several days to allow appellants to petition the Supreme Court. On November 16, 1972, after a hearing in chambers, Mr. Justice Marshall ordered that the stay be continued pending argument before this court, and directed that the appeal be heard on an expedited basis. We continued the stay pending decision.

Unhappily the variety and difficulty of the questions raised have prevented our rendering this as soon as we should have wished.

### III. *Standing.*

As is usual in welfare cases, before coming to the merits we must weave our way through a maze of problems relating to standing and jurisdiction. The complaint raised both constitutional and statutory claims, which we state at this point only insofar as necessary to an understanding of the preliminary issues. It alleged, as against the state defendants, that because the two projects were imposed on only a portion of those eligible for AFDC benefits, these defendants violated the equal protection clause of the Fourteenth Amendment, and that the New York statutes with respect to hearings for suitability for the projects and the failure to develop specific standards and procedures applicable to the participants violated the due process clause.[12] The most important statutory claims were that the projects were so basically inconsistent with the Social Security Act as to lie beyond the power of approval of demonstration projects vested in the Secretary of HEW by 42 U.S. C. § 1315; that the record before the Secretary was inadequate to warrant such approval under the standards laid down in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S. Ct. 814, 28 L.Ed.2d 136 (1971); and that the approval was inadequate because of its failure to waive compliance with the work incentive (WIN) provisions of the Social Security Act, 42 U.S. C. § 602(a)(19). We shall consider the standing of each set of plaintiffs to raise each type of claim.

■ At first blush it would seem almost too clear for argument that relief

---

11. The state officials were permitted to continue the projects on a voluntary basis but elected not to do so on the ground that projects so restricted would not yield the desired information.

12. The complaint alleges that the hearing provisions violate the due process clause

of the Fifth, not the Fourteenth, Amendment. Although the approval process of HEW might bring the matter within the purview of the Fifth Amendment, we assume—since the briefs were clearly directed to this point—that reference to the Fourteenth Amendment was intended.

recipients within the general class at which a work program is aimed would have standing to challenge it on both constitutional and statutory grounds. Compare Sierra Club v. Morton, 405 U. S. 727, 732, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972); Trafficante v. Metropolitan Life Ins. Co., 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972).[13] The state defendants contest this on the basis that, except for Hyacinth Cadogan, none of the plaintiffs has been found to be employable and, on their own allegations, will not be found to be. We are not at all sure that this is an answer; the threat of compulsory enrollment would seem enough, except perhaps when there was no rational basis for fear. However, it is unnecessary to pursue the subject since, if Mrs. Cadogan has standing,[14] it is immaterial whether the other individual plaintiffs have this.

■ Relying on ·Sierra Club v. Morton, *supra,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636, the district court held that the seven welfare organizations lacked standing. Appellants contend that the judge read the decision too expansively. They point to passages in the Court's opinion emphasizing that "[t]he Sierra Club failed to allege that it or its members would be affected in any of their activities or pastimes" by the development the Club sought to challenge, 405 U.S. at 735, 92 S.Ct. at 1366, pointing out that "[t]he Club apparently regarded any allegations of individualized injury as superfluous, on the theory that this was a 'public' action involving questions as to the use of natural resources, and that the Club's longstanding concern with and expertise in such matters were sufficient to give it standing as a 'representative of the public' ",

*id.* at 736, 92 S.Ct. at 1367; and suggesting, *id.* at 735–736 n. 8, 92 S.Ct. at 1367, that the Club might amend its complaint to show injury to members. The complaint here alleges that members of at least some of the organizations are potential subjects of the projects and that other members will suffer from a worsening of the overall welfare administration situation if the projects are implemented. We agree that this suffices to give these organizations standing under the general federal question statute, 28 U.S.C. § 1331, but see fn. 13 *supra,* or, if it were applicable, 28 U.S.C. § 1361.

■ The question whether the welfare organizations have standing under the civil rights statute, 42 U.S.C. § 1983, and its jurisdictional implementation, 28 U.S.C. § 1343(3), is more difficult. Section 1983 confers a cause of action on "any citizen of the United States or other person within the jurisdiction thereof" who has been deprived under color of state law "of any rights, privileges, or immunities secured by the Constitution and laws." Neither this language nor the history recently reviewed in Lynch v. Household Finance Corp., 405 U.S. 538, 92 S.Ct. 1113, 31 L.Ed.2d 424 (1972), suggests that an organization may sue under the Civil Rights Act for the violation of rights of members. All of the justices who formed the majority in Hague v. CIO, 307 U.S. 496, 514, 527, 532, 59 S.Ct. 954, 83 L.Ed. 1423 (1939), seem to have held the contrary, and this portion of *Hague* was not overruled by *Lynch.* We do not regard the line of decisions beginning with NAACP v. Alabama ex rel. Patterson, 357 U.S. 449, 458–460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958), and continuing through Bates v. City of Little Rock, 361 U.S. 516, 523 n.

---

13. It should be clear that we are here discussing only the issue of *standing; jurisdiction* with respect to the statutory claims is another matter because of the $10,000 amount requirement of 28 U.S.C. § 1331.

14. We are unpersuaded by the state defendants' argument that Mrs. Cadogan

has suffered no damage from participating in PSWOP by working mornings in the New York City Hall library sorting books for the few days before PSWOP was temporarily restrained. If she could not lawfully be compelled to do the work she is doing, that is damage enough.

9, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960), and Louisiana ex rel. Gremillion v. NAACP, 366 U.S. 293, 296, 81 S.Ct. 1333, 6 L.Ed.2d 301 (1961), to NAACP v. Button, 371 U.S. 415, 428–429, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963), as having altered that principle in any way helpful to the organization plaintiffs here. The statements in those opinions that the organization has standing to assert the rights of its members were made in the context of a claim of abridgment of the constitutional right of association; indeed, in all but the last case, the right to refrain from disclosure of membership because of the adverse effect of disclosure on both the association and the members was the very point at issue. See NAACP v. Alabama ex rel. Patterson, *supra*, 357 U.S at 459–460, 78 S.Ct. 1163. While the Court said in Sierra Club v. Morton, *supra*, 405 U.S. at 739, 92 S.Ct. at 1368, "[i]t is clear that an organization whose members are injured may represent those members in a proceeding for judicial review," followed by a citation to *Button*, we think this must be limited to the issue there *sub judice*, standing to seek review of the action of federal officers, and not as broadening the standing of organizations as plaintiffs under the Civil Rights Act. See National Welfare Rights Organization v. Wyman, 304 F.Supp. 1346, 1348 (E.D. N.Y.1969); Crossen v. Breckenridge, 446 F.2d 833, 839 (6 Cir. 1971).

██ The complaint asserted that implementation of the projects for a year would impose additional administrative costs on New York City, which Administrator Sugarman estimated to aggregate a net amount exceeding $2,500,000 per annum. Although the state defendants contend that this figure is excessive, they do not dispute that the City will be confronted with substantial added costs. The district court held that the City had standing to assert the statutory claims against the federal defendants, as is not here disputed, but that, under Williams v. Mayor and City Council of Baltimore, 289 U.S. 36, 40, 53 S.Ct. 431, 77 L.Ed.

1015 (1933), it had no standing to assert constitutional claims. While this may be true with respect to New York City itself, we see no sufficient answer to the argument that Board of Education v. Allen, 392 U.S. 236, 241 n. 5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968), requires a recognition of standing on the part of plaintiff Sugarman to assert constitutional claims. Like the school board members in that case, he is faced with what he deems a conflict between his oath to support the United States Constitution and his duty under state law to carry out the New York projects. While *Allen* was an appeal from the New York Court of Appeals, Mr. Justice White said, 392 U.S. at 241 n. 5, 88 S.Ct. 1923, that the conflict there visited upon school board members gave them a "personal stake in the outcome" of the litigation, citing Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962). If they thus had standing to press a constitutional claim in the Supreme Court, although their pocketbooks were in no way affected, we fail to see why Sugarman does not have similar standing to assert constitutional claims in the district court, as the citation of Baker v. Carr, an action begun in a federal district court, with jurisdiction predicated on 28 U.S.C. § 1343(3), would imply. We also are by no means certain that the reasoning of *Williams*, that "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the· Federal Constitution, which it may invoke in opposition to the will of its creator," 289 U.S. at 40, 53 S.Ct. at 432, applies to a claim by a city that federal action violates the Fifth Amendment. The state, not the federal government, has "created" the city. While a city is not a citizen entitled to privileges and immunities under section 2 of Article IV, or section 1 of the Fourteenth Amendment, we would not consider that the issue whether, for some purposes, such as a claim of discriminatory treatment affecting its finances, it might not be a "person" entitled to protection under the

Fifth Amendment was necessarily foreclosed by South Carolina v. Katzenbach, 383 U.S. 301, 323–324, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966), although it may be difficult to see how a city can be a "person" if its progenitor is not. On the other hand, a city would clearly lack standing to raise due process claims (*e. g.*, lack of fair hearing) relating to its citizens.

The upshot of all this is:

1) At least plaintiff Cadogan has standing to raise both constitutional and statutory claims.

2) At least some of the welfare organizations have standing to raise statutory claims.

3) The City has standing to raise statutory claims, and Sugarman has standing to raise both constitutional and statutory claims. The City lacks standing to assert constitutional claims against the State; we need not decide whether it is totally deprived of standing to raise constitutional claims against the federal defendants.

### IV. *Jurisdiction*

Such difficulty as exists with respect to jurisdiction stems from the $10,000 jurisdictional amount requirement in the general federal question statute, 28 U.S.C. § 1331, and the ruling in Snyder v. Harris and the companion case of Gas Service Co. v. Coburn, 394 U.S. 332, 335, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969) forbidding aggregation of the class action claims save in the two circumstances there stated.[15]

Some avenues of escape proposed by plaintiffs must be rejected. The Social Security Act is not an "Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States," 28 U.S.C. § 1343(3), so as to remove the jurisdictional amount requirement for the statutory claims. McCall v. Shapiro, 416 F.2d 246, 249 (2 Cir. 1969); Almenares v. Wyman, 453 F.2d 1075, 1082 n.9 (2 Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972). Neither is the Social Security Act an "Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies" within 28 U.S.C. § 1337. *Id.* Finally, despite the breadth with which we have read 28 U.S.C. § 1361, see United States ex rel. Schonbrun v. Commanding Officer, 403 F.2d 371, 374–375 (2 Cir. 1968), cert. denied, 394 U.S. 929, 89 S.Ct. 1195, 22 L.Ed.2d 460 (1969); Cortright v. Resor, 447 F.2d 245, 250–51 (2 Cir. 1971), cert. denied, 405 U.S. 965, 92 S.Ct. 1172, 31 L.Ed.2d 240 (1972), we cannot properly characterize this as an "action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

We are also unwilling to follow the district court in avoiding the jurisdictional amount problem with respect to the statutory claims by reliance on § 10 of the Administrative Procedure Act, 5 U.S.C. § 702, as an independent grant of jurisdiction. The Supreme Court has not squarely faced this recurring problem. Professor Davis, Administrative Law Treatise, § 23.02 (Supp.1970), cites Rusk v. Cort,[16] 369 U.S. 367, 82 S.Ct.

---

15. As in Almenares v. Wyman, supra, 453 F.2d at 1083, n. 11, we again do not find it necessary to pass on the correctness of Bass v. Rockefeller, 331 F.Supp. 945 (S.D.N.Y.), appeal dismissed as moot, 464 F.2d 1300 (2 Cir. 1971) with respect to aggregation. See Note, Federal Jurisdiction over Challenges to State Welfare Programs, 72 Colum.L.Rev. 1404, 1428–32 (1972).

16. Byse and Fiocca, Section 1361 of the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L. Rev. 308, 329 n. 76 (1967), point out that the only explicit discussion of jurisdiction—in Justice Brennan's concurring opinion, 369 U.S. at 380, 82 S.Ct. at 794 —"may have intended another nuance of the term 'jurisdiction,'" since his discus-

787, 7 L.Ed.2d 809 (1962) and Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L. Ed.2d 947 (1968), as having settled that § 10 of the APA constituted an affirmative grant, and it is indeed hard to see how else jurisdiction could have existed. However, neither opinion adverted to the issue, and it is impossible to believe that the Court would have disposed of so important a question *sub silentio*.[17] Also, the final paragraph of Oesterreich v. Selective Service Board, 393 U.S. 233, 239, 89 S.Ct. 414, 21 L.Ed.2d 402 (1968), looks to us like a reference to jurisdictional amount, although Professor Davis ingeniously argues against this, § 23.02 at 792–793. See also Breen v. Selective Service Local Board, 396 U. S. 460, 90 S.Ct. 661, 24 L.Ed.2d 653 (1970). Our own decisions are similarly inconclusive. While Cappadora v. Celebrezze, 356 F.2d 1, 5–6 (2 Cir. 1966), assumed that § 10 of the APA was a jurisdictional grant, Wolff v. Selective Service Board, 372 F.2d 817, 826 (2 Cir. 1967), indicated that jurisdictional amount must be met in an action against federal officers. In Mills v. Richardson, 464 F.2d 995, 1001 n.9 (2 Cir. 1972), we said that the question whether the APA was an independent jurisdictional grant had not been determined in this circuit. The problem is not an easy one, and decision will be rendered unnecessary if Congress should accept the sound recommendation of the Administrative Conference, 1 Recommendations and Reports of the Administrative Conference of the United States 169 (1970), that, whatever may be done generally

with respect to jurisdictional amount in federal question cases, the time has long since come to adopt the proposal, made by Professor Herbert Wechsler when the Judicial Code was last revised, Federal Jurisdiction and the Revision of the Judicial Code, 13 Law & Contemp.Prob. 211 (1948), that jurisdictional amount has no place in actions against federal officers.

 Combining those claims in which we have found standing with this court's liberal application of the doctrine of pendent jurisdiction, Astor Honor, Inc. v. Grosset & Dunlap, Inc., 441 F.2d 627 (2 Cir. 1971); Leather's Best, Inc. v. S.S. Mormaclynx, 451 F.2d 800, 809 (2 Cir. 1971); and Almenares v. Wyman, *supra*, 453 F.2d at 1083–1086, suffices to sustain jurisdiction over both types of claims against both sets of defendants. Under 28 U.S.C. § 1343(3) the district court had jurisdiction of Mrs. Cadogan's and Sugarman's constitutional claims[18] against both sets of defendants. Under 28 U.S.C. § 1331 it had jurisdiction over the City's statutory claim against both sets of defendants since the City's allegation that it had more than $10,000 at stake was clearly substantiated. The other claims have a "common nucleus of [law and] fact" with these. United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). Under these circumstances it would be absurd to fragmentize this litigation, especially when, as in *Almenares*, all the claims are federal in nature.

---

sion applied equally to the APA and to the Declaratory Judgment Act—the latter of which clearly does not grant independent jurisdiction. Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950). Indeed, the majority opinion, 369 U.S. at 372, 82 S. Ct. 787, focuses its discussion on the policies behind the Declaratory Judgment Act. Professor Byse and Mr. Fiocca conclude, 81 Harv.L.Rev. at 330, that while "the question remains open," "the Supreme Court should hold that section 10 confers jurisdiction." See, for a conclu-

sion similarly based on considerations of policy, Jaffe, Judicial Control of Administrative Action 165 (1965).

17. Professor Davis also cites Leedom v. Kyne, 358 U.S. 184, 79 S.Ct. 180, 3 L. Ed.2d 210 (1958), but that action clearly fell within 28 U.S.C. § 1337 even though the draftsman of the complaint had not cited it.

18. As will later be shown, at least one of these, the due process claim with respect to hearings, was substantial.

## V. *The Statutory Claims*

As instructed by Thorpe v. Housing Authority of the City of Durham, 386 U.S. 670, 87 S.Ct. 1244, 18 L.Ed.2d 394 (1967), King v. Smith, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968), and other cases, we begin by considering the claims that, for a variety of reasons, the approval of the Secretary of HEW was ineffective to authorize the departures from requirements of § 402 of the Social Security Act, 42 U.S.C. § 602, concerning state plans for aid and services to needy families with children which PSWOP and IFI concededly involve.

 We note preliminarily that consideration of these claims, like those in Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), takes us into a type of judicial review considerably more difficult to define and exercise than traditional review of administrative action. We have here no adversary hearing, no record, no statement of the grounds for the Secretary's action,[19] except as these may be inferred from the papers on which he acted and from the largely unhelpful documents prepared specifically for this litigation.[20] While we shall follow the guidelines helpfully stated in *Overton*, 401 U.S. at 416–17, 91 S.Ct. 814, so far as applicable, we find more merit than do the plaintiffs in the defendants' position that, purely legal issues apart, it is legitimate for an administrator to set a lower threshold for persuasion when he is asked to approve a program that is avowedly experimental and has a fixed termination date [21] than a proposal, like that in *Overton Park*, which is irreversible. Moreover, *Overton Park* dealt with a situation where an administrator was required to make two highly specific determinations on the basis of explicit, legislatively prescribed considerations, rather than reach an over-all "judgment". In saying this we are not insensitive to the impact these projects may have on the lives of thousands of people, many of whom are in "brutal need," Goldberg v. Kelly, 397 U.S. 254, 261, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Yet the Secretary could properly take into account the growing antagonism to the welfare system and the possibility that, unless the public is satisfied that every reasonable effort is being made to induce employable recipients of assistance to work, pressure on governors and state legislators might cause the level at which needs are met to be reduced well below New York's 90%, with far greater ultimate hardship than these projects may entail.

Appellants claim that the Secretary exceeded his authority under 42 U.S.C. § 1315 in two respects. The first is that there was no basis on which the projects could be deemed "likely to assist in promoting the objectives" of the specified parts of the Social Security Act. Appellants argue that the objective of federal participation in the AFDC program, as stated in 42 U.S.C. § 601, is to assist the states "to furnish financial assistance and rehabilitation and other services" which will encourage "the care of dependent children in their own homes or in the homes of relatives"—not to force their parents or relatives, or themselves, to work.

 This takes too narrow a view of Congress' purpose. To begin, Congress must have realized that extension of assistance to cases where parents, relatives

---

19. The task of reviewing courts would be greatly facilitated by such statements, however brief and informal.

20. As noted in *Overton Park, supra*, 401 U.S. at 419, 91 S.Ct. 814, such affidavits are "merely 'post hoc' rationalizations" for administrative action, and cannot be given great weight.

21. The project requests were for three-year programs for PSWOP and a one-year program for IFI. The June 1, 1972, approval letter from HEW for PSWOP granted approval for one year and provided that requests for approval to continue for a second year were to be made on the basis of an evaluation of the first nine months of the program's activities. In addition, the HEW Handbook of Public Assistance Administration § 8240 provides for rescission of approval at any time during a project's life.

or the child himself was capable of earning money would diminish the funds available for cases where they were not. While common sense would lead to that conclusion, one does not have to resort to that useful tool. As shown in King v. Smith, *supra*, 392 U.S. at 327–29, 88 S. Ct. at 2128, the committee reports and floor debates incident to enactment of the AFDC program as part of the Social Security Act of 1935, 49 Stat. 620, are full of references to the concept that the ideal was a situation in which the family "breadwinner" would win the needed bread and that public assistance was a solution only for those children whose natural "breadwinner" was dead, incapacitated, or continually absent. Beyond that, 42 U.S.C. § 601 itself states as one of the purposes of the program "to help such parents or relatives to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection . . . ." Further, Congress has on a number of occasions indicated its view that such "capability" is enhanced by projects enabling the parents or relatives to work. The 1935 Act contained a section, 409, 42 U.S.C. § 609, for community work and training programs quite similar to those here at issue; while that section was repealed in 1968, it was replaced by the Work Incentive (WIN)

Program, 42 U.S.C. §§ 630–53. The WIN program is a work-relief program virtually identical in scope and design to New York's PSWOP;[22] in fact, with respect to wage minimums PSWOP and especially IFI, which explicitly provides that participants shall receive the same fringe benefits as their co-workers, are more advantageous to the participant than WIN.[23] In the face of Congress' expression of its belief in the possible efficacy of this type of program, most recently reaffirmed in the 1971 amendments to the WIN program, 85 Stat. 803, appellants' arguments that the New York programs are contrary to the objectives of AFDC are clearly misdirected. Although the stereotype envisioned by Congress was doubtless the situation where the male member of the family wins the bread, the work relief concept is broad enough to cover cases where a female family member is capable of contributing to the family's support, provided that the children are properly cared for during her absence from the home. Indeed, the eligibility requirements of the WIN program do not distinguish between male and female relatives.

Next in breadth is appellants' contention that 42 U.S.C. § 1315 does not permit the Secretary to waive any requirement of § 602 which might result in the curtailment or denial of assistance.[24]

22. The May 31, 1972, approval letter for PSWOP, and also counsel for the state appellees at oral argument, indicated that the need for these new projects arose not from deficiencies in the scope or structure of WIN, but from the limited extent of its implementation in New York. Apparently the state preferred to have projects in which the initiative for implementation rested in its own hands.

23. Counsel for the plaintiffs urge that, in addition to possible wage differentials, participants in IFI and PSWOP will be disadvantaged relative to participants in WIN because "WIN guarantees the availability of a full range of services designed to insure . . . that the family will be aided in making the necessary adjustment . . . ." While WIN regulations, 45 CFR § 220.35(b)(2)(i) make a wide range of supportive services, listed in id.

§ 220.18 et seq., available to AFDC recipients, the WIN program in no way guarantees their availability. Indeed, the HEW WIN Handbook § 80.6 (1972) states that the only service which must be provided before certification under 42 U.S.C. § 602(a)(19) is a medical examination, and that the only service which must be available before entering a work project is child care. Both these services appear to be elements of the New York projects in equal measure and with parallel provisions for insuring adequacy.

24. We refer here to the imposition of conditions for AFDC eligibility in addition to those included in the Act which may lead to suspension or termination based on refusal to participate. As indicated above, n. 4, we do not envision any loss in the amount of assistance by participants.

Conceding that on its face 42 U.S.C. § 1315 permits waiver of the basic requirement that aid be furnished "to all eligible individuals" within the state, 42 U.S.C. § 602(a)(10), appellants rely on bits of legislative history which, in their view, demonstrate that the sole purpose of § 1315 was to permit experiments in administrative techniques free from the requirement of 42 U.S.C. § 602(a)(1) for statewide uniformity. If that was the sole purpose, it would be hard to understand why the waiver authority was so extensive. In fact, the passages in the Committee reports on which appellants rely, S.Rep.No.1589, 87th Cong., 2d Sess. 19–20, 1962 U.S.Code Cong. & Adm.News, pp. 1943, 1961–62 (1962); H.R.Rep.No.1414, 87th Cong.2d Sess. 24 (1962), do not carry the day for them; the Senate Report says that "[t]he public assistance titles of the Social Security Act contain a number of requirements on the States for approval of a State plan" which "often stand in the way of experimental projects designed to test out new ideas and ways of dealing with the problems of public welfare recipients," and cites the statewise uniformity requirement only as "one example." We likewise find unpersuasive the arguments that the examples given in the Congressional hearings and in the HEW Handbook of Public Assistance Administration issued on its enactment concerned the development of new services and improving administration. This is rather a case, in Mr. Justice Frankfurter's phrase, "for applying the canon of construction of the wag who said, when the legislative history is doubtful, go to the statute." Greenwood v. United States, 350 U.S. 366, 374, 76 S.Ct. 410, 415, 100 L.Ed. 412 (1956). The limitation, and the only limitation imposed on the Secretary was that he must judge the project to be "likely to assist in promoting the objectives" of the designated parts of the Social Security Act. California Welfare Rights Organization v. Richardson, 348 F.Supp. 491 (N.D.Cal.1972).

This bring us to the question whether the Secretary had a rational basis for determining that the programs were "likely to assist in promoting the objectives" of Part A of Subchapter IV. The Action Memorandum on PSWOP informed the Secretary that the New York Department of Social Services expected the following results:

A. Decreased costs of public assistance.

B. Increased self-support or self-care of recipients.

C. Increased initiative of recipients.

D. Increased self-respect of recipients.

E. Increased community participation.

F. Improved public attitude toward public welfare.

The Action Memorandum on IFI said:

The State anticipates that "Incentives for Independence" will increase self-support or self-care of present recipients. The impact of the project on the behavior and attitudes of welfare recipients will be analyzed. The State also wishes to determine whether such a program is administratively feasible or efficient, and whether it modifies the attitude of the public toward welfare. The objectives of the project include:

1. Employment of able-bodied adults.

2. Development and use of employability skills in young adults.

3. Education and motivation of school-age children.

It is impossible to deny that attainment of these goals, or even of some of them, would meet the test of 42 U.S.C. § 1315. Appellants' criticisms, apart from those already rejected, are rather that the programs simply cannot in fact achieve the objectives or any of them. In its comprehensive letter submitted to the Department and transmitted to the Secretary along with the Action Memorandums, the Center on Social Welfare Policy and Law criticized the projects on nu-

merous grounds, among others, alleged differentials between the payments to the participants and those to regular employees,[25] the coercive effects of the programs, lack of adequate standards with respect to child care, the absence of specificity concerning the types of jobs to which welfare recipients will be assigned and the standards that would justify refusal to participate, the unlikelihood that experience in the types of jobs indicated as likely candidates would qualify a welfare recipient for employment in the general economy, and the improbability that many such jobs will be available.[26] It also developed other possible and less harsh means for improving public attitude toward the welfare program, e. g., by demonstrating how large a proportion of the recipients were in fact unemployable and the absence of employment opportunities. As indicated, the State submitted two memoranda, which were also transmitted to the Secretary, one identifying the objections and the other endeavoring to answer them, an endeavor that was successful at least to a substantial degree.

 We are satisfied that the materials before the Secretary sufficed

for "a consideration of the relevant factors" by him and that there was no "clear error of judgment" on his part. *Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. 814. While the Center's arguments were impressive, they were to some extent contradictory—that the programs would have a massive adverse effect on welfare recipients, and that there were so few employables and employment opportunities that the programs could not prove anything. Ascertainment by actual demonstration whether the latter claim is true would itself be a legitimate objective. Moreover, as previously indicated, we think the Secretary could properly give weight to the fact that the programs were of limited duration and would remain under the on-going supervision (with the power to terminate approval) of HEW. Experience will be the best test of the reality of appellants' fears, and a strong showing would be required to demonstrate that the Secretary could not properly subject them to it. In this respect, appellants ask us to administer a prophylaxis against possible adverse results from the Secretary's determination far beyond the limited review outlined in

25. In light of the terms of the program we do not understand how such differentials could occur except for the point that PSWOP participants will not share in "the extras or fringe benefits earned by regular employees." We are not told what such extras or fringe benefits would be in the case of public employees in so early a stage of employment. In any event we do not believe that the absence of such benefits violates congressional policy in the welfare area. 42 U.S.C. § 609(a)(1)(B), now repealed, required only that the rates of pay be "not less than the minimum rate (if any) provided by or under State law for the same type of work and not less than the rates prevailing for similar work in the community," the same phrase used in PSWOP and IFI. We have found no regulation reading the language of § 609 (a)(1)(B) to include fringe benefits. The successor to § 609, the WIN program, 42 U.S.C. § 633(e)(4), is even less favorable to welfare recipients; it requires only that "[n]o wage rates provided under any agreement entered into

under this subsection shall be lower than the applicable minimum wage for the particular work concerned." The Work Incentive Program Handbook, § 9360(2)– 3 adds that if no minimum wage is applicable, "the wage must not be substantially less favorable than the wage normally paid for similar work in that labor market, but in no event, less than three-quarters of the Federal minimum wage." Again, nothing is said expressly pertaining to fringe benefits, and we have been cited to no practice for their inclusion. It must also be realized that participants in the programs here attacked receive substantial benefits in the way of free child care and assurance of immediate resumption of assistance not provided for the ordinary worker.

26. The State has indicated that it will require local departments of social services in PSWOP areas to develop a "sufficient number and variety" of projects to insure that all unemployed employable AFDC recipients receive jobs. See PSWOP Policy and Procedures, at 6.

*Overton Park.* Whether we would have been convinced by the State's case if we had been in the Secretary's shoes is immaterial. "The court is not empowered to substitute its judgment for that of the agency." *Overton Park, supra,* 401 U.S. at 416, 91 S.Ct. at 824.

Still another set of objections by the individual and welfare organization appellants is that the Secretary had inadequate information concerning many details. However, the material furnished by the State in justifying the programs and applying for approval[27] adequately covered the policy, budgetary and logistical essentials, and the statute —speaking in terms of an otherwise unfettered "judgment"—does not require that, before the Secretary approves an experiment, every i must be dotted and every t crossed. A more important objection is that the material before the Secretary affirmatively showed the incapacity of state and local welfare and employment agencies to take on this added task. New York City eagerly joins in claiming it cannot do the job the State has assigned it. Appellants call attention to the phrasing of a letter from HEW's Assistant Administrator, Research and Administrations, to the Center saying only:

> We have no reason at this time to assume that New York will be unable to carry out the provisions of the demonstrations

and argue that this is a far cry from a finding that the ability exists. But this case does not involve "adjudication required by statute to be determined on the record after opportunity for an agency hearing," 5 U.S.C. § 554(a), to which alone the requirement of findings, 5 U.S.C. § 557(c), applies. Moreover, the same letter continues:

> A major purpose of the evaluation will be to assess the administrative feasibility of IFI and PSWOP.

If, for example, the programs succeeded in some districts and failed in others, this might reveal whether a difference in the quality of administration was the reason and whether increased expenditure on or better organization of administration was essential. Only if the materials showed such administrative incapacity as to negate any appreciable possibility of success would the Secretary's approval be arbitrary and capricious. This was not the case. Rather, as indicated in our summary of HEW's review, *supra,* HEW, as conditions to implementing the programs pursuant to its November 1971, and June 1972 approvals, demanded assurances of the State's capacity to perform, with which it was presumably satisfied.[28]

Appellants' final statutory claim[29] is that the Secretary's action is ineffective because it did not expressly waive compliance with 42 U.S.C. § 602(a)(19), which requires every State plan to pro-

---

27. In contrast to Citizens to Preserve Overton Park, *supra,* 401 U.S. at 412 n. 28, 91 S.Ct. at 821, we find no indication in the legislative history behind § 1315 that "the Secretary is not to limit his consideration to information supplied by state and local officials but is to go beyond this information and reach his own independent decision"—at least if this were read to require him to make a further field investigation rather than simply to consider the comments of objectors and the views of his own staff.

28. Plaintiffs argued also that a provision in HEW's Handbook of Public Assistance Administration directing that "[a]pplications [for § 1315 approval] will be appraised with respect to the clarity of the plan and the ability of the agency to

provide for methods or organization, administration, and staffing which holds reasonable promise of carrying out the project effectively" imposes a stricter standard to which HEW must be held. See Cappadora v. Celebrezze, *supra,* 356 F.2d at 6. However, in view of our discussion of the permissible purposes of the projects, in particular the projects' usefulness in determining local administrative capabilities, defendants have not unreasonably deviated from their own rules.

29. In their complaint, plaintiffs also raised HEW's failure to waive the provisions of 42 U.S.C. § 602(a)(7) and (8) as to PSWOP. These sections would appear to require any AFDC program to disregard certain income received by recipients, and

vide for the prompt referral [30] of certain welfare recipients to the Secretary of Labor for participation in the WIN program. It is not immediately apparent from the language of § 602(a)(19) whether this merely demands such a program, which the New York State AFDC plan has, or outlaws any other state work program, as held by a three-judge court in this circuit in a decision, Dublino v. New York State Department of Social Service, 348 F.Supp. 290 (W.D.N.Y.1972), now on appeal to the Supreme Court, consideration of jurisdiction postponed to hearing on the merits, 41 U.S.L.W. 3391 (Jan. 16, 1973); see also Jeffries v. Sugarman (S.D.N.Y. 1972), an appeal from which is now pending before this court; Woolfolk v. Brown, 325 F.Supp. 1162 (E.D.Va.1971), aff'd 456 F.2d 652 (4 Cir. 1972). If the Supreme Court should reverse or seriously restrict the holding in *Dublino*, appellants' argument would be largely drained of force. However, it would be quite improper for us to endeavor to anticipate the Court's decision, and we think it undesirable to decide an issue now pending before that Court and this if decision can be avoided. We believe it can be.

The "stick" in the WIN program is the provision, 42 U.S.C. § 602(a)(19) (F), whereby individual aid may be reduced (or, in one instance eliminated) whenever an individual has been found by the Secretary of Labor to have refused without good cause to participate in a project established under the program, or has "refused without good cause to accept employment in which he is able to engage which is offered through public employment offices of the State, or is otherwise offered by

an employer if the offer of such employer is determined, after notification by him, to be a bona fide offer of employment." Although on their face the two latter provisions, the first of which would be here applicable, do not seem to be limited to employment procured through the WIN program, in which event waiver of 42 U.S.C. § 602(a)(19) clearly would not be required here, they appear to have been generally read as limited to persons participating in WIN programs see e. g., Woolfolk v. Brown, *supra*, 325 F.Supp. at 1169, and we shall assume, without deciding, that this is what they mean. However, there is force in the defendants' contention that the Secretary's waiver of the basic requirement for payment of assistance "to all eligible individuals", 42 U.S.C. § 602(a)(10), includes waiver of any further conditions to eligibility implicit in the program. It is clear, both from the entire context and from specific references in the materials before him, that the proponents and opponents of the projects and the Secretary were well aware that the PSWOP and IFI work programs differed in some respects from WIN; indeed their very purpose was to provide employment for AFDC recipients not participating in a WIN program. It would elevate form over substance to issue a temporary injunction against the operation of these projects until the Secretary went through the formality of adding 42 U.S.C. § 602(a)(19) to the list of sections compliance with which was being waived.

## VI. *The Constitutional Issues*

We deal first with appellants' claims that the different treatment of the 25% of the State welfare recipients in the

---

PSWOP contains no provision for such disregard. However, plaintiffs in their brief to this court specifically note that at the preliminary injunction stage they are raising only the failure to waive section 602(a)(19) and prefer to raise the other claims of inadequate waiver at the trial. But see footnote 4 *supra*.

30. 42 U.S.C. § 602(a)(19) as in effect at the time of the Secretary's approval in June, 1972, required "referral" to the Secretary of Labor. The 1971 Amendments to the WIN program, 85 Stat. 802 (December 28, 1971), effective July 1, 1972, directed that each AFDC shall register with the state WIN agency, which in turn shall "certify" eligible participants to the Secretary of Labor.

areas chosen for inclusion in PSWOP and the 2.5% of such recipients chosen for inclusion in IFI from that accorded welfare recipients in the rest of the State violates the Equal Protection Clause of the Fourteenth Amendment.

Dandridge v. Williams, 397 U.S. 471, 484–86, 90 S.Ct. 1153, 1162, 25 L.Ed.2d 491 (1970), decided that despite the fact that "the administration of public welfare assistance . . . involves the most basic economic needs of impoverished human beings," claims of denial of equal protection in the allocation of welfare benefits did not invoke the "strict scrutiny" developed by the Court for equal protection claims where "fundamental rights" were at stake. The Court has since reaffirmed this in Richardson v. Belcher, 404 U.S. 78, 92 S.Ct. 254, 30 L.Ed.2d 231 (1971), and Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). As said in the latter case, 406 U.S. at 546–547; 92 S.Ct. at 1731:

> So long as its judgments are rational, and not invidious, the legislature's efforts to tackle the problems of the poor and the needy are not subject to a constitutional straitjacket. The very complexity of the problems suggests that there will be more than one constitutionally permissible method of solving them.

If the standard of review is as limited as held in *Dandridge*, appellants' equal protection claim does not reach the level of substantiality. However, it has been recently suggested, see Gunther, The Supreme Court, 1971 Term, Foreword: In Search of Evolving Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1, 17–24 (1972), that the Court is developing a standard more stringent than that limned in *Dandridge* but lower than "strict scrutiny"—whether as a replacement for the "two-tiered equal protection" which many have found unsatisfactory, see Weber v. Aetna Casualty & Surety Co., 406 U.S. 164, 177, 92 S.Ct. 1400, 31 L.Ed.2d 768 (1972) (dissenting opinion of Mr. Justice Rehnquist), or as

a narrowing of the gap between the tiers. Even if the standard here applicable is "that a statutory classification bear some rational relationship to a legitimate state purpose," Weber v. Aetna Casualty & Surety Co., *supra*, 406 U.S. at 172, 92 S.Ct. at 1405 (Mr. Justice Powell), or that "an appropriate governmental interest [is] suitably furthered by the differential treatment," Chicago Police Department v. Mosley, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972) (Mr. Justice Marshall), the test was met here.

A purpose to determine whether and how improvements can be made in the welfare system is as "legitimate" or "appropriate" as anything can be. This purpose is "suitably furthered" by controlled experiment, a method long used in medical science which has its application in the social sciences as well. As Mr. Justice Brandeis said in his famous dissent in New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932), "To stay experimentation in things social and economic is a grave responsibility." Just as the Due Process clause should not have been read to condemn the experiment in the "laboratory" of "a single courageous State" involved in *New State*, the Equal Protection clause should not be held to prevent a state from conducting an experiment designed for the good of all, including the participants, on less than a statewide basis. The objections to allowing officials "to pick and choose only a few to whom they will apply legislation and thus to escape the political retribution that might be visited upon them if larger numbers were affected," eloquently voiced in Mr. Justice Jackson's concurring opinion in Railway Express Agency v. New York, 336 U.S. 106, 111, 69 S.Ct. 463, 93 L.Ed. 533 (1949), are inapposite to the selection, on a random but rational basis, of certain areas of the state to try out a program for the very purpose of determining whether it, or some variation of it should be made applicable to all. The Equal Protection

1110

clause does not place a state in a vise where its only choices in dealing with the problems of welfare are to do nothing or plunge into statewide action. Once it is determined that New York may justifiably conduct an experiment in certain areas, appellants' objections, going to details, *e. g.*, that there was no need for so large a sample as PSWOP's 25%,[31] that the areas chosen were not shown to have any greater need than others, etc., do not require discussion. As said by Mr. Justice Holmes, dissenting in Louisville Gas Co. v. Coleman, 277 U.S. 32, 41, 48 S.Ct. 423, 426, 72 L.Ed. 770 (1928), "when it is seen that a line or point there must be, and that there is no mathematical or logical way of fixing it precisely, the decision of the Legislature must be accepted unless we can say that it is very wide of any reasonable mark." See also Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S. Ct. 337, 55 L.Ed. 369 (1911); Metropolis Theatre Co. v. Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 57 L.Ed. 730 (1913).

Appellants' due process objections center about the procedures for determining whether welfare recipients are employable within the criteria of the two projects or, even if so, have "good cause" for declining a particular job opportunity.[32] While we do not consider appellants' contention that the standards for determining eligibility and good cause are too vague for fair enforcement to be substantial, we are concerned with the adequacy of the opportunity for a hearing. Although the plans provide for a "fair hearing" under 18 N.Y.C.R.R. § 385 before assistance to an AFDC recipient can be suspended for unjustified failure to accept a job opportunity or to continue to work thereon, appellants argue that this right is unconstitutionally burdened by the provisions of 18 N.Y.C.R.R. § 385.7 that if the result of the hearing is adverse, the recipient shall "be disqualified for thirty days thereafter" and until such time as he is willing to comply. This seems to mean that even if the recipient accepts the determination of the hearing and is willing to take a referral immediately, he would nevertheless be deprived of assistance for thirty days.

The procedural aspect of this element of the case is somewhat puzzling. The thirty-day suspension provision of 18 N.Y.C.R.R. § 385.7 is one of general application, not part of the two projects here sought to be enjoined. Although 28 U.S.C. § 2281 applies to statewide regulations as well as to statutes, see Oklahoma Gas Co. v. Russell, 261 U.S. 290, 43 S.Ct. 353, 67 L.Ed. 659 (1923),

---

31. Appellants argue that if 2.5% sufficed for IFI, it should also have sufficed for PSWOP. But IFI is a relatively minor variation on PSWOP, and the State could rationally determine that a larger sample was needed to test the basic program than the embroidery upon it.

32. Appellants suggest that good cause would exist if the project did not meet the State's minimal requirements, such as:

1. Reasonable assurance that work will be performed in such a manner to insure that the work is useful;

2. Persons assigned to such projects will not be used to replace, to perform any work ordinarily and actually performed by regular employees of any department or other unit of government, or to replace or to perform any work which would ordinarily be performed by craft or trade in private employment. (In the event of an extreme emergency, such as a flood, fire, etc., such a restriction could be waived so long as the work to be performed was work normally undertaken by the sponsor of the project.);

3. Appropriate standards of health, safety and other conditions are established and maintained. Participants should be given adequate protection against hazards or activities which would adversely affect their health;

4. Sanitary facilities should be supplied or available, and a basic standard of cleanliness be maintained;

5. Participants shall be required to perform only those physical activities which are within their established physical capabilities;

6. Adequate first-aid supplies shall be available at the site of the project.

neither the complaint nor the motion for interlocutory relief sought an injunction against the enforcement of the thirty-day suspension provision as such, and, despite a contrary intimation in the district court's opinion, plaintiffs not only did not ask for the convocation of a three-judge court but alleged that none of the claims in the complaint, save one as to the unconstitutionality of 42 U.S.C. § 1315, which was not being pressed on the motion for a temporary injunction, would require the convening of such a court. Yet, if it is sought to enjoin 18 N.Y.C.R.R. § 385.7, a statewide regulation, on due process grounds, a three-judge court might well be required,[33] and arguably appellants cannot here press a point which they failed to pursue in the district court in the only effective manner.

The State's brief says that so long as the injunction issued by the district court in *Dublino, supra,* 348 F.Supp. 290, remains in effect "the thirty-day suspension of benefits mandated by 18 N.Y.C.R.R. § 385.7 will not be invoked against any recipient, including those affected by PSWOP and IFI." It suggests also that "[t]he validity of that statewide regulation should be determined in general, rather than relating to the demonstration projects alone." We take this to mean that New York would wish to be able to continue the demonstration projects even if the thirty-day suspension provision were held unconstitutional, whether through the issuance of an injunction by a three-judge court or, possibly, a declaratory judgment by a single judge, contrast Kennedy v. Mendoza-Martinez, 372 U.S. 144, 154–55, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963), with Great Lakes Dredge & Dock Co. v. Huffman, 319 U.S. 293, 63 S.Ct. 1070, 87 L. Ed. 1407 (1943); see American Law Institute, Study of the Division of Jurisdiction Between State and Federal Courts 322–323 (1969).

The question of the constitutionality of § 385.7 has its difficulties. Presumably the argument in favor of the thirty-day suspension is that it constitutes the only effective sanction against the assertion of claims for a hearing in every case, with a consequent breakdown of the entire work program, since otherwise an adverse determination would simply require the recipient to do what he should have done long before. Yet a somewhat similar argument concerning proliferation of hearings did not win favor in Goldberg v. Kelly, 397 U.S. 254, 265–66, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), on the issue there presented. Appellants argue that the necessitous circumstances of welfare recipients make the risk of a thirty-day suspension, even for the one family member concerned, totally unacceptable; as a practical matter, the suspension thus operates as a denial of a hearing before an unemployable recipient, or one with good cause for refusal, is forced to accept employment, with possibly drastic results for his children. Compare Oklahoma Operating Co. v. Love, 252 U.S. 331, 40 S.Ct. 338, 64 L.Ed. 596 (1920).

We are reluctant to decide such a difficult question with the almost total absence of briefing the defendants have afforded. The State's entire discussion of the point takes less than a page; the only citations are *Goldberg,* which scarcely assists it, and a statement in *Dublino, supra,* 348 F.Supp. at 299, that "[t]he Commissioner's representations effectively nullify plaintiffs' argument on the absence of and need for a fair hearing upon a determination of employability and before termination . . . ." There is nothing to inform

---

33. We recognize the perennial question whether the attack would be on § 385.7 as such or only "as applied" in connection with PSWOP and WIN, in which event a three-judge court would not be needed since these projects are not statewide. Moody v. Flowers, 387 U.S. 97, 87 S.Ct. 1544, 18 L.Ed.2d 643 (1967); Board of Regents v. New Left Education Project, 404 U.S. 541, 92 S.Ct. 652, 30 L.Ed.2d 697 (1972). See D. Currie, The Three-Judge District Court in Constitutional Litigation, 32 U.Chi.L.Rev. 1 (1964).

us whether argument in *Dublino* focused on the thirty-day suspension. The brief of the federal defendants is equally cursory on this point, with *Dublino* the only citation.[34]

 In light of the State's representation that the thirty-day suspension will not be enforced so long as the *Dublino* injunction remains in effect, the district judge could have thought there was no immediate need for granting temporary injunctive relief on that issue. We believe, however, the plaintiffs should have protection, if that injunction should be dissolved, pending judicial resolution of the validity of the thirty-day suspension clause. On this issue, although not on the rest of the case, we consider plaintiffs to have met the test of Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2 Cir. 1953), that if the balance of hardships tip decidedly in their favor, "it will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberate investigation." We therefore direct that the denial of the temporary injunction be modified so as to enjoin the State defendants from enforcing the thirty-day suspension until its validity with respect to PSWOP and IFI has been finally determined.

As so modified, the order denying the temporary injunction is affirmed. The stay heretofore entered is continued until ten days after the filing of this opinion and if, within that period, an application for a further stay is made to the Supreme Court pursuant to its Rules 50 and 51, until the decision thereof. No costs.

---

34. We think it appropriate to note how little help we have received from the defendants' briefs—a circumstance not unusual in welfare cases. Three-quarters of the State's brief deals with questions of standing and jurisdiction; it contains no table of cases as required by F.R.A.P. 28(b). The largely conclusory brief of the federal defendants contains neither an index nor a table of cases, similarly required. Although the appeal was heard on an expedited basis, it had been pending in the district court for several months, and counsel must have anticipated that an appeal would be taken whatever the result below.