Annette GLOVER, on behalf of herself, and her minor child Chalyce, Shirley Hook, on behalf of herself and her minor child Paul, and all others similarly situated,

East Harlem Block Nursery, Inc., et al., Plaintiffs,

v.

Georgia L. McMURRAY, Individually and as Commissioner of the Agency for Child Development of the City of New York, et al., Defendants.

No. 73 Civ. 1798.

United States District Court, S. D. New York.

May 24, 1973.

Louis York, New York City, for plaintiffs; Michael Diamond, New York City, of counsel.

Marttie L. Thompson, New York City, for plaintiffs; by Marcia J. Cleveland, New York City, of counsel.

Louis J. Lefkowitz, Atty. Gen., for defendant Abe Lavine; by Jerold Probst, Deputy Asst. Atty. Gen., of counsel.

Norman Redlich, Corp. Counsel, New York City, for defendants Georgia L. McMurray and Jule M. Sugarman; by Paula J. Omansky, New York City, of counsel.

OPINION AND ORDER

DUFFY, District Judge.

This complicated case arises out of a dispute over the confidentiality of records kept in connection with publicly funded day care centers in New York City. The plaintiffs are a group of these day care centers and the parents and children who use them as recipients. Defendants are the state and city officials charged with administering day care. The nub of the controversy is whether or not defendants may require parents and/or day care centers to fill out and submit application forms containing information about the family as a prerequisite to receiving public funds. Plaintiffs claim that this requirement violates the Social Security Act, 42 U.S. C. § 601 et seq. and their constitutional rights as guaranteed by the First and Fourteenth Amendments.

There are approximately 400 publicly funded day care centers in New York City. Pursuant to Section 403, Title IV–A of the Social Security Act, 42 U. S.C. § 603, the federal government reimburses the state for 75 per cent of the cost of the centers, as long as the state maintains an approved plan which conforms to federal guidelines. New York's state plan was approved by the Secretary of Health, Education and Welfare in 1971. Under the state plan, the New York State Department of Social Services (the Department) is responsible for overall administration, but the immediate supervision of day care services is delegated to local agencies such as the New York City Human Resources Administration and its subdivision, the Agency for Child Development (ACD). In New York City, the ACD contracts with individual centers for the actual provision of day care services.

In February 1973, the Department issued an Administrative letter requiring as a condition for state reimbursement, the use of a new eligibility form DSS 2105, "or an approved local equivalent" by all local departments of social services and providers of day care, effective April 1, 1973. The forms were to be filled out for each family by the providers of day care and submitted to the local agency for review. They were part of a new statewide "Social Services Information System" developed in response to federal regulations and intended to strengthen state and local control over the provision of social services.

The state delegated to the city the job of securing compliance from the day care centers. On March 14, Commissioner McMurray of the ACD sent copies of form DSS 2105 to all 400 centers with a memorandum requesting that the forms be completed for all clients currently in the program, or at least as many as possible, by March 23. On March 30, she sent a letter to the centers which had not complied, warning them that no further funds would be authorized unless they submitted the forms by April 9, and informing them of a meeting to be held April 4 to discuss ACD's procedures for compliance. At the April 4th meeting, alternate proposals for providing eligibility information were advanced and taken "under advisement" by Commissioner McMurray. None of the plaintiff day care centers met the April 9 deadline. On April 12, Commissioner McMurray informed them by letter that their funding would be terminated as of April 18, that ACD would no longer be responsible for their insurance, and that their books would be closed and equipment removed by April 30. She enclosed a letter to the parents informing them of "their right to have their status determined" (Exhibit D), and assuring them that "if eligible, your children will be placed in an alternate day care service in your neighborhood." (See Appendix).

On April 23, plaintiffs commenced this action by filing a complaint demanding declaratory and injunctive relief. On April 24 they filed an order to show cause for a temporary restraining order and a preliminary injunction enjoining defendants from (1) terminating services to the individual plaintiffs or (2) requiring submission of DSS 2105,

and ordering defendants (3) to resume funding immediately and (4) to refrain from taking any steps to dismantle plaintiff day care centers. The temporary restraining order was denied and the motion for the preliminary injunction was argued before this Court on May 3. Defendants have subsequently cross-moved· to dismiss the complaint for lack of subject matter jurisdiction and failure to state a claim for relief.

The question whether to grant a preliminary injunction is complicated by the fact that the two groups of plaintiffs present different yet overlapping claims. Both the centers and the recipients allege that the use of form DSS 2105 by the defendants violates the Social Security Act, 42 U.S.C. § 601 et seq. However, the centers' claim is based on the conflict between their duty to obey the State's directives and their duty to abide by the federal regulations, as well as the direct violation of the rights of the recipients. The recipients' claim is limited to violations of their statutory rights. Both groups of plaintiffs also allege that the use of the form infringes their constitutional rights to privacy and equal protection; and further, that it was selectively applied to them because of their membership in an organization advocating community control of day care, thus violating their rights to free speech and association. Finally, the recipients also claim that the manner in which the funding was terminated denied them due process of law and violated their statutory rights to notice and a hearing under Section 402 of the Social Security Act, 42 U.S.C. § 602(a)(4) and regulations thereunder, 45 C.F.R. § 205.10.

I. *Standing and Class Action Status*

■ Before this Court can reach the merits, the threshold questions of standing and jurisdiction must be broached. As indicated above, plaintiffs' claims can be divided into two broad categories: (1) those relating to the required submission of form DSS 2105 (the confidentiality claims); and (2) those relating to the procedures followed in terminating the funding (the due process claims). Each category contains both statutory and constitutional claims. The claims in the first category are raised by both the individual and corporate plaintiffs; those in the second category are raised only by the individual plaintiffs. As the direct beneficiaries of the day care services involved, the individual plaintiffs clearly have standing to raise statutory and constitutional claims in either category. Indeed, their standing is not contested.

■■ The standing of the corporate plaintiffs presents a more complicated question. Defendants urge that under a recent ruling of the Second Circuit, the corporate plaintiffs have standing only to raise the statutory claims. In Aguayo v. Richardson, 473 F.2d 1090 (2d Cir. 1973), the Court ruled that the Civil Rights Act, 42 U.S.C. § 1983, does not confer standing on organizations to sue for violations of the constitutional rights of their members. Here, plaintiff day care centers claim that the use of form DSS 2105 violates their own First and Fourteenth Amendment rights in addition to those of their members. It has long been established that corporations as well as individuals are protected by the First Amendment and by the Due Process and Equal Protection Clauses of the Fourteenth Amendment. NAACP v. Button, 371 U.S. 415, 428, 83 S.Ct. 328, 9 L.Ed.2d 405 (1962); Grosjean v. American Press Co., 297 U.S. 233, 56 S.Ct. 444, 80 L.Ed. 660 (1935). Plaintiff day care centers therefore have standing to raise on their own behalf both First and Fourteenth Amendment claims, as well as the statutory claims. With regard to the claims of their members, they have standing to raise only the statutory claims. Aguayo v. Richardson, *supra*.

■ The question of class action status under Rule 23, Fed.R.Civ.P., also requires separate determination for the recipients and the centers. The recipients have met the necessary prerequi-

sites for a class action. It appears from the affidavits that the class numbers in the hundreds, making joinder impractical. There are clearly questions of law and fact common to the members of the class, and the claims raised by the representative parties are typical of those of the class. The affidavits also give adequate assurance that the representative parties will fairly protect the interests of the class. Finally, there can be no question that the defendants have "acted or refused to act on grounds generally applicable to the class, thereby making appropriate injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed.R.Civ.P. 23(b)(2). The recipients may therefore prosecute this suit as a class action.

The centers, on the other hand, are insufficiently numerous to merit class action status. Plaintiffs have submitted no affidavits regarding class size, although they estimate in their complaint that twenty-five to thirty centers have had their funding terminated. Commissioner McMurray in her affidavit states that "all but about fifteen centers complied" with the directive to submit form DSS 2105. A group as small as fifteen or thirty cannot maintain a class action unless special circumstances make the joinder of all members impracticable. Fed.R.Civ.P. 23(a)(1); Demarco v. Edens, 390 F.2d 836, 845 (2d Cir. 1968); Giordano v. Radio Corporation of America, 183 F.2d 558 (3d Cir. 1950). The primary factor to be considered in deciding whether joinder is practical is the geographical location of the other potential plaintiffs. Dale Electronics, Inc. v. R. C. I. Electronics, Inc., 53 F.R.D. 531 (D.N.H.1971); Phillips v. Sherman, 197 F.Supp. 866 (N.D.N.Y. 1961). Here the other day care centers are all located within New York City. I therefore find that the class is not so numerous that joinder of all members is impractical. Fed.R.Civ.P. 23(a)(1).

II. *Jurisdiction*

Plaintiffs rely on two bases of jurisdiction, 28 U.S.C. § 1343(3) and (4) and 28 U.S.C. § 1331. Where, as here, a plaintiff sues under 42 U.S.C. § 1983 for a violation of constitutional rights, jurisdiction is conferred by 28 U.S.C. § 1343 unless the claim is so insubstantial as to be frivolous. Baker v. Carr, 369 U.S. 186, 82 S.Ct. 691, 7 L. Ed.2d 663 (1962); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). The due process claims of the recipients are clearly not frivolous. The recipients claim that Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L. Ed.2d 287 (1970) requires the state to give them notice and an opportunity for a hearing before terminating the funding of their day care center. In Goldberg v. Kelly, the Supreme Court held that under the Due Process Clause of the Fourteenth Amendment, welfare recipients were entitled to an evidentiary hearing before termination or suspension of benefits. In reaching this decision, the Court balanced the extra expense to the state against the individual's overwhelming need not to be wrongfully deprived of assistance. Plaintiffs urge that the same balancing test applied in the case at bar would compel the same result. Their affidavits show that their need for day care services may be as overwhelming as the need for welfare assistance of the plaintiffs in Goldberg v. Kelly. Under these circumstances, their due process claim cannot be termed legally frivolous. Gasaway v. McMurray, 356 F.Supp. 1194 (S.D.N.Y., 1973).

Since all the claims in this action stem from a "common nucleus of operative fact," United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966), jurisdiction based on any of the constitutional claims provides a source of ancillary jurisdiction over the statutory claims and the other constitutional claims. Aguayo v. Richardson, *supra*; Almenares v. Wyman, 453 F.2d 1075, 1083–1086 (2d Cir. 1971). Alternatively, 28 U.S.C. § 1331 confers jurisdiction over the statutory claims of the plaintiff day care centers, since the budget of each center exceeds

the $10,000 jurisdictional amount required by Section 1331. The existence of pendent jurisdiction makes it unnecessary to decide whether the recipients' claims could be aggregated to meet the jurisdictional amount.

III. *The Merits*

In deciding whether to grant a preliminary injunction, it is neither necessary nor proper to make a final ruling on the merits. Rather, the Court must limit its determination in this case to the questions of the plaintiffs' likelihood of ultimate success, the nature and degree of harm to the plaintiffs if the motion is denied and, balanced against this, the hardship to the defendants if the motion is granted. Gulf & Western Industries Inc. v. Great Atlantic & Pacific Tea Company, Inc., 476 F.2d 687 (2d Cir., 1973).

In order to avoid reaching the constitutional questions unnecessarily, the statutory claims will be considered first. The recipients allege that defendants disregarded the procedures for notice and hearing established by the Secretary of Health, Education and Welfare pursuant to the Social Security Act, 42 U.S.C. § 602(a)(4). In addition, both the recipients claim that by requiring the use of form DSS 2105 the defendants violated several other provisions of the Social Security Act, 42 U.S.C. §§ 602(a)(7), 602(a)(14), and regulations thereunder.

Turning first to the question of notice and hearing, the recipients claim that the letter sent by defendant McMurray, informing them that the centers were about to lose their funding and that parents should call the "Resource Center" in their area to learn their rights, failed to comply with federal regulations, 45 C.F.R. § 205.10. A glance at the regulations leaves little doubt that they were not followed; the real issue is whether they are applicable. Commissioner McMurray argues that "[t]he fair hearing requirements come into play only when the applicant is deter-

mined to be ineligible and is refused service for that reason." Since no determination of eligibility or ineligibility has been made in the case of any of the individual plaintiffs, the argument goes, there was no refusal of service and no right to a fair hearing.

There are two problems with this argument. It does not correctly characterize the procedural requirements of the fair hearing regulations and it does not take into account that the procedure used in this case involved a suspension of services pending a determination of eligibility.

■ The fair hearing provisions promulgated by the Secretary of H.E.W.[1] at 45 C.F.R. § 205.106 require that:

"(2) Every claimant will be informed in writing at the time of application and at the time of any action affecting his claim: (i) Of his right to fair hearing; (ii) Of the method by which he may obtain a hearing;

. . .

"(3) An opportunity for a fair hearing before the State agency will be granted to any individual requesting a hearing because . . . he is aggrieved . . . by agency policy as it affects his situation. Under this requirement:

. . . . . .

(iv) The fair hearing shall include consideration of:

(b) The agency's interpretation of the law, and the reasonableness and equitableness of the policies promulgated under the law, if the claimant is aggrieved by their application to his situation;"

It is at least arguable that the decision to require form DSS 2105 was "agency action affecting [the] claim" of every day care recipient and that a notice of right to a hearing should have been sent to the parents when the change in policy was announced. That question is not before the Court. But it cannot be de-

---

1. The authority to issue rules and regulations is conferred by Section 1102 of the Social Security Act, 42 U.S.C. § 1302.

nied that the decision to close the centers without offering immediate alternative day care services constituted agency action affecting the claims of the parents and children who used the centers, and therefore triggered the fair hearing provisions.

If the parents and children had been offered immediate alternative services pending a determination of their eligibility, a different question would be presented. Here the recipients were notified that their services were being suspended until they proved their eligibility. The regulations do not permit such a suspension without adequate notice.

 In fact, the hearing procedures are designed to prevent the suspension of services until a final determination is reached. This is accomplished by a requirement that the notice be mailed 'at least 15 days before the proposed action is to be taken, and that the individual be afforded an opportunity within the advance notice period "to discuss his situation with agency staff, obtain an explanation of the reasons for the proposed action, and present information to show that the proposed action is incorrect." Furthermore:

"(5)(iii)(a) In cases in which there is a request for a fair hearing within the advance notice period:

(1) Assistance is continued until the fair hearing decision is rendered and through a period consistent with the State's established policies for issuance of payments unless a determination is made by the State agency, in accordance with criteria issued by the Social and Rehabilitation Service, that the issue is one of State agency policy and not one of fact or

judgment relating to the individual case . . . ."

Thus, under no circumstances may assistance or services be suspended until 15 days after notice of the suspension and an explanation of their hearing rights has been sent to the recipients. In this case the letter to the parents was mailed six days at most [2] before the termination of funding to the centers and consequent suspension of services to the recipients. The letter furthermore contained none of the material required by the regulations. These procedures seriously violated the statutory rights of plaintiff parents and children.

 This does not mean that assistance or services may not be denied to a person who refused to furnish evidence of eligibility. Indeed, the regulations provide otherwise. 45 C.F.R. § 206.-10(a)(12)(iii)(c). No suspension may occur, however, unless "timely and adequate notice" is given. 45 C.F.R. § 206.-10(a)(7). Notice to the day care centers is not notice to the parents. The regulations draw a clear distinction between provisions which apply to the claimant "or his representative" (45 C.F.R. §§ 205.10(a)(3)(i), 205.10(a)(5)(ii)), and provisions which apply to the claimant alone. The notice requirement is met only by written notice to the claimant himself. 45 C.F.R. § 205.-10(a)(2).

Plaintiffs also challenge the legality of form DSS 2105. They claim first that it violates Section 402(a)(7) of the Social Security Act, 42 U.S.C. § 602(a)(7) [3] by failing to provide a deduction for work-related expenses in calculating net earned income. According to the form, net earned income is arrived at by deducting personal income taxes, health insurance premiums and

---

2. The letter was dated April 12, and the complaint alleges that the day care centers received it April 16 and 17.

3. The statute provides: (a) A State plan for aid and services to needy families with children must . . . (7) provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid . . . or of any other individual . . . whose needs the State determines should be considered in determining the need of the child or relative claiming such aid, as well as any expenses reasonably attributable to the earning of any such income.

support payments from gross earned income.

 Defendant Lavine asserts in his brief that this method of calculating net earned income was approved by the Secretary of H.E.W. in 1971, and that plaintiffs' claim is therefore without merit. This does not sufficiently answer plaintiffs' argument. Approval by the Secretary, while necessary to the federal funding of a state plan under Section 401 of the Social Security Act, 42 U.S.C. § 601 does not preclude independent review by the federal courts to assure compliance with federal standards. Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971); Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). On the record before this Court the method used by the State to calculate net income appears to be in flat contradiction with the federal statute.

Plaintiffs' final statutory claim is that the oath at the end of form DSS 2105 and the Social Security number which together "give defendants free rein to investigate parents" are "specifically prohibited by federal regulations." The oath reads as follows:

> "I hereby apply for services and certify that all of the information contained herein is true and correct to the best of my knowledge and belief and that no facts have been omitted. *I make this application with the understanding that I will furnish any additional information which may be required,* and I will report immediately, any changes in circumstances, including changes in financial resources.
>
> "*I understand that my application may be investigated and I agree to cooperate in such an investigation.* I further understand that the law provides for fine or imprisonment, or both, for a person hiding facts or not telling the truth." (Emphasis added.)

Plaintiffs contend that the underlined portions of this oath conflict with Section 206.10(a)(12)(iii)(a) which states:

> "(12) In determining initial and continuing eligibility:
>
> (iii) . . . (a) The agency takes no steps in the exploration of eligibility to which the applicant or recipient does not agree. It obtains specific consent for outside contacts, gives a clear explanation of what information is desired, why it is needed, and how it will be used; . . . "

Plaintiffs argue that the blanket consent to be "investigated" and agreement "to cooperate in such an investigation" constitutes a waiver of the right to be specifically consulted concerning each step of an investigation. Although the oath does not explicitly waive this right, it does so implicitly by referring repeatedly to the recipient's obligation to disclose information and to assist in the agency's investigation, while omitting any reference to his right to know why the information is required and how it will be used.

 This interpretation is corroborated by the instructions included with the forms. The instructions, addressed not to applicants but to staff members of the day care centers, direct the staff member to include at least six items of verification data as part of the completed form. These items include birth certificates, employer's statements of employment, doctor's statements of illness, court orders of support, and health insurance premiums. No mention is made in the instructions of the duty to inform the applicant of why these items are needed or how they will be used. According to the instructions, they are routinely required, despite a federal regulation, 45 C.F.R. § 205.20(a)(3) stating that verification should be resorted to only in special circumstances. 45 C.F.R. § 205.20(a) directs the states to develop a simplified method for determination of eligibility and limits the need for verifying data as follows:

> "(a) . . . (3) When under the simplified method, statements of the applicant or recipient are incomplete, unclear or inconsistent, or where other

circumstances in the particular case indicate to a prudent person that further inquiry should be made, and the individual cannot clarify the situation, the State agency will be required to obtain additional substantiation or verification."

This regulation embodies the federal policy of relying primarily on the applicant for eligibility information and consulting the agency's records or other sources only when further information is needed. The blanket consent to be investigated contained in form DSS 2105, especially when combined with the State's overly broad verification procedures, conflicts with the federal policy reflected in the regulations. For this reason, I find a strong likelihood that plaintiffs will succeed in proving that the oath as now written should not be required.

 Nothing in the regulations, however, precludes the defendants from gathering the information included on form DSS 2105 in a manner compatible with the rights of the individual plaintiffs. Plaintiffs argue that the only information required to determine eligibility is "gross income, deductions, number in family, and reason for day care," and that all eligibility information should be stored at the day care centers to preserve confidentiality. This argument must fall since the federal regulations do not restrict the states to collecting information only for the purpose of determining eligibility. For example, the states are also enjoined to "safeguard" the following types of information under 45 C.F.R. § 205.50(a)(2):

" . . . (b) Information related to the social and economic conditions or circumstances of a particular individual;

(c) Agency evaluation of information about a particular individual;

(d) Medical data, including diagnosis and past history of disease or disability, concerning a particular individual."

In addition, the states are required to cooperate with the family in developing and maintaining "service plans" for each family and child who requires service, plans which are "responsive to the needs of each individual within the family, while taking account of the relation of individual needs to the functioning of the family as a whole". 45 C.F.R. § 220.16. Lastly, the regulations require "maximum utilization of and coordination with other public and voluntary agencies . . ." 45 C.F.R. § 220.8. These requirements, undoubtedly intended to increase the effectiveness of service under Title IV–A, are not compatible with the strict curbs on state access to information urged by the plaintiffs. Of course, if the plaintiffs later demonstrate that the defendants will use this information for purposes incompatible with the goals of the Social Security Act, a different case will be presented. So far, there has been no showing that defendants plan to abuse the confidences of the individual plaintiffs.

 The centers are therefore not likely to succeed in showing that by submitting the eligibility forms to ACD they would violate the statutory rights of the recipients. First, as stated above, the regulations allow the states to collect confidential information for purposes connected with the administration of the program. 45 C.F.R. § 205.50(a). The State avers that form DSS 2105 is to be used for such purposes. Second, the submission of the forms to ACD by the centers would not in itself violate the recipients' right to have work expenses taken into consideration in determining eligibility. Only the defendants, by using the forms to determine eligibility, would violate that right. Thirdly, the centers have not shown that the questionable verification procedures included with the forms forced them to violate federal regulations. They have not demonstrated that submitting the forms without verification would have resulted in the termination of their funding. Certainly, they could have consulted the parents, as required by federal regulations, before including any items of verification. If they did not know, they

were in a position to discover why the information was needed and how it would be used. Finally, the requirement of the oath was imposed directly by the state, and the centers were in no way implicated in this violation of the recipients' rights. They could only become implicated if they proceeded to investigate the recipients based on the waiver. Therefore, the conflict between state and federal regulations on which the centers' statutory claim is based does not appear to have forced them to violate federal regulations.

Nor do the centers seem likely to prevail on their constitutional claims. The discriminatory treatment by Commissioner McMurray which allegedly violated their rights to free speech and association is explained in her affidavit as caused by legitimate administrative needs. Further, the centers' claim of a denial of equal protection is unsubstantiated.[4]

IV. *The Preliminary Injunction*

■ The recipients have met the standards required for the issuance of a preliminary injunction. They have demonstrated a strong likelihood of success on the merits of most of their statutory claims. They have further shown that they will be irreparably injured if injunctive relief is denied. The parents face loss of jobs and work training if day care services are not immediately restored to their children, and the children face further disruption of their education and psychological development. These injuries are not obviated by the defendants' offer to place the plaintiff children in alternate day care services "if eligible" because under the law the children have a right to uninterrupted service while their eligibility is being re-evaluated. The injury to the defendants occasioned by the granting of the injunction is a pecuniary one which does not outweigh the injury which would otherwise be suffered by the recipients.

The defendants are therefore ordered to restore day care services to the recipients immediately. If this requires resuming the funding of the plaintiff centers, they must do so. In addition defendants must reimburse the plaintiff centers for any day care services they may have rendered during the pendency of this action, if the parents certify in writing that they have received these services.

Defendants are further enjoined from denying day care services to any applicant or recipient because of failure to submit form DSS 2105 until the form is revised in accordance with this opinion.

So ordered.

## APPENDIX

Dear Parent:

We regret to inform you that because of the failure of your center to submit information verifying the eligibility of families to receive publicly subsidized day care services, funds are being withdrawn from your center.

State and federal regulations mandate that recipients of public assistance and Social Services be informed of their right to a Fair Hearing, should their services be discontinued. However, the method of termination differs relative to individual status and kind of service received.

Because you have not identified the category from which your eligibility could or could not be determined, we can only inform you of your rights when the information required is submitted.

To inform you of your rights and to determine your eligibility, please call the

---

4. Since the issues raised by the centers on their own behalf do not seem "serious, substantial and difficult," Gulf & Western Industries, Inc. v. Great Atl. & Pac. Tea Co., *supra*, 476 F.2d at 692. I find it unnecessary to balance the equities between the centers and the defendants. Exxon Corp. v. City of New York, 480 F.2d 460 (2d Cir., 1973).

Resource Center Director in your area. JOSEPHINE CLARK at 433–6618. If eligible, your child will be placed in an alternate day care service in your neighborhood.

> Very truly yours,
>
> s/ Georgia L. McMurray
> Commissioner, ACD